NOS. 4-07-0079, 4-07-0080 cons.    Filed 2/26/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| LONNA BENJAMIN, | ) | Appeal from |
|      Plaintiff-Appellee, | ) | Circuit Court of |
|      v. (No. 4-07-0079) | ) | Pike County |
| TERRY McKINNON, | ) | Nos. 06OP17 |
|      Defendant-Appellant. | ) |      06OP18 |
| -------------------------------------- | ) | |
| LONNA BENJAMIN, | ) | |
|      Plaintiff-Appellee, | ) | |
|      v. (No. 4-07-0080) | ) | Honorable |
| JEREMY McKINNON, | ) | Michael R. Roseberry, |
|      Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In separate April 5, 2006, petitions, plaintiff, Lonna Benjamin, sought orders of protection against defendant Terry McKinnon and defendant Jeremy McKinnon, Terry's son.  That same day, the trial court granted ex parte emergency orders of protection against both defendants.  In June 2006, plaintiff filed amended order-of-protection petitions.  After a September 2006 hearing on the amended petitions, the court granted plaintiff an order of protection for one year against Jeremy but denied her one against Terry.  Jeremy filed a motion to reconsider, and Terry filed a motion for sanctions under Supreme Court Rule 137 (155 Ill. 2d R. 137).  After a January 2007 hearing, the court denied both motions.

Defendants appeal, asserting (1) the order of protec-

tion against Jeremy should be vacated because Jeremy does not fall under the definition of "family or household member" and (2) the trial court erred by denying Terry's Rule 137 motion. We affirm.

## I. BACKGROUND

Plaintiff sought an order of protection against Jeremy and Terry based on a verbal skirmish that took place at her residence in the early morning hours of April 1, 2006. In her order-of-protection petitions, plaintiff marked "other related by blood or marriage" as her relationship to Jeremy and Terry. The trial court granted plaintiff emergency orders of protection against defendants. In May 2006, Terry filed a motion to dismiss, asserting, inter alia, that he was not related by blood or marriage to plaintiff. He noted one of his children had been married to one of plaintiff's children but that the couple divorced in October 2005. After a June 2006 hearing, the court denied Terry's motion. (A transcript of that hearing is not included in the record on appeal.)

On September 6, 2006, the trial court held a hearing on the petition for plenary orders of protection. Lonna testified on her own behalf. She stated that at approximately 2 a.m. on April 1, 2006, she was watching television when she heard a vehicle "come barreling down the street." She looked out the window and saw the vehicle stopped for approximately a minute at

- 2 -

a stop sign.  She said the pickup truck she saw looked to her like Jeremy's.  She then heard the truck "rev just like someone laid on the gas pedal, just revved up."  Lonna estimated her house to be about 40 to 50 feet from the stop sign.  Lonna stated that the truck drove past the stop sign, stopped, and then Jeremy got out of the vehicle.

Lonna went outside to the front porch.  Lonna testified, "[Jeremy] was yelling and screaming that--saying [']that pussy mother--send that pussy mother fucker out so I can beat his ass.[']"  Lonna testified she knew Jeremy to be referring to her son Lucas because Lucas and Jeremy "have had history."  Lonna stated that she asked Jeremy to leave the property and that he responded that he "'would kill all you mother fuckers.'"  She again told Jeremy to leave the property. Jeremy did not leave, and Lonna and Jeremy "argued back and forth."

Eventually, Jeremy exited the yard and moved to the side of the street.  Lonna testified, "[Jeremy] was calling me all kinds of filthy names."  She stated that Jeremy referred to her as a "bitch" and a "whore."  She said, "[Jeremy] grabbed his private parts and said, [']I can touch you in places you've never been touched before.[']"

Lonna testified that it was then that she noticed her husband Larry, her sons Lucas and Logan, and Logan's girlfriend

Billy Jo Surratt, were all outside on the porch. Lonna stated that Jeremy was trying to get Lucas to come down to the street. She said Jeremy threatened to kill Lucas and the whole family. She stated that she had reason to be fearful of Jeremy because her grandchildren were inside the house and because "anybody that would come to someone's house at that hour of the morning I think that they would act on their words."

Approximately three and five minutes after Jeremy arrived, his father Terry also arrived at the Benjamins' house. Lonna testified that Terry "jokingly" tried to get Jeremy back in his truck. As Terry was driving off, Lonna stated the he pointed to her son Logan and said "something to the effect of [']that's right, you better leave, slugger,['] or something like that." She testified that Terry pointed his finger at Logan and said, "['][Y]ou better watch your ass, boy, or you'll get some of it too.[']"

Lonna testified that she feared Terry because she knew that he had been convicted for stabbing his own nephew. She said the actions of both Jeremy and Terry made her extremely upset. She said Jeremy appeared to be under the influence of alcohol that night. She said Jeremy was "extremely loud" and that he had slurred speech. She also observed that he was staggering. She testified that he appeared to be drunk "or impaired in some way."

Lonna's husband, Larry, also testified that he observed

the events that night as Lonna described and that Jeremy's behavior caused him to be extremely upset. He testified, "You know, any time someone threatens to kill my whole family, yes, it's upsetting." Larry testified that he could not recall exactly what Lucas was saying in response to Jeremy; however, Larry recalled Lucas indicating that if Jeremy came into their yard he would beat him up.

On cross-examination, Larry testified that there was "bad blood" between the two families. When asked whether the bad blood was caused by criminal activity, namely Lucas's home invasions, Larry responded that "[a] lot of that has to do with [Jeremy] threatening my family." Larry testified that Lucas had been arrested because of complaints made by Terry's daughter and Jeremy's sister (and Lucas's former wife), Tara. Larry could not recall whether Lucas had been arrested for home invasion. Larry denied that Lucas had a reputation for being a troublemaker. On the night in question, Larry stated that his youngest son, Logan, told Terry that he "better go on down the street" which elicited Terry's response, "['][Y]ou better watch your ass boy. You're going to get some of it too.[']"

Billy Jo Surratt testified that she was Logan's girlfriend and living in the Benjamins' house at the time. She also observed the events that night around 2 a.m. outside the Benjamins' house. She testified she heard Jeremy tell Lonna he

- 5 -

was going to kill her whole family. She also heard Jeremy call Lonna a "bitch" and a "whore." After Terry arrived, Billy Jo testified she went back inside the house and did not observe anything further. On cross-examination, Billy Jo testified that she initially went outside to the porch because she heard an engine "revving" outside. She testified that she only heard what Jeremy said while the argument ensued outside on the porch and could not recall what anyone else said.

At the conclusion of plaintiff's evidence, defense counsel made a motion for a directed judgment asserting plaintiff had failed to establish a family relationship between the parties. Plaintiff's attorney responded they had already litigated the matter on Terry's motion to dismiss. The trial court noted the issue of a family relationship had already been brought before the court and denied the motion for a directed judgment.

Lonna was called as an adverse witness by Jeremy and Terry. She testified that Lucas had pending court cases involving Class X felonies. The victim in those cases was her son Lucas's ex-wife Tara, Jeremy's sister and Terry's daughter. Lonna testified that Lucas's felony charges were pending when she filed the petition.

When asked whether she had any family relationship with Terry at all, Lonna answered, "I don't know how to answer that."

She also testified that she was not Jeremy's mother-in-law.

Terry testified that when he arrived at the Benjamins' that night, he did not observe anyone threaten anyone else. He stated Jeremy did not punch anyone and he did not go onto the Benjamins' property. He said that he observed Jeremy in the street arguing with Lucas. Terry testified that Lucas's actions were, "[l]ike Jeremy's. They were just a word battle is all it was." Terry did not observe Jeremy grab his crotch. Terry testified Lucas got his dog, which "looked like some kind of a lab maybe, golden lab, pretty good size dog." He said he did not know whether Lucas had the dog by a chain or the collar, but he was trying to "sic" the dog on Jeremy but the dog would not do it. Terry said eventually he got Jeremy in his truck and went back to his truck to leave. At this point, Terry testified the McKinnons were calling him "[']fat ass, queer, and baldy.[']" He could not recall exactly who was saying these things to him. Terry stated that he laughed at them while he was walking back to his truck because they were calling him these names. Terry denied that he threatened Logan while he was leaving.

On cross-examination, Terry testified that it was Cindy McKinnon, his ex-wife, who called him that night and told him to go to the Benjamins' house to get Jeremy. Terry testified he went to the Benjamins' house because he did not want to see Jeremy get in trouble. Terry testified that he had not been

- 7 -

drinking that night and that he does not drink. He testified that he did have a conviction in Calhoun County for aggravated battery.

Jeremy testified that earlier in the evening he had been at Palace, a bar in Calhoun County. He stated that he saw Lucas at the bar with Jeremy's sister and Lucas's ex-wife, Tara, although Tara had been issued an order of protection preventing Lucas from being near her. The trial court took judicial notice of this order. Jeremy said that he and Lucas "had words" at the bar. Jeremy testified that he asked Lucas to leave the bar, but Lucas refused. Jeremy said he left the bar with his cousin Greg; and when they returned to the bar, Lucas and Tara were gone.

Jeremy testified, "I got upset, and that's why I went into Pleasant Hill [(where the Benjamins lived)] and done what I done." Jeremy stated that he went first to his sister Tara's house to look for her. When he did not find her at home, he went to the Benjamins' house to search for Tara. Jeremy denied that he was barreling down the road or revving his engine when he approached the Benjamins' house. He stated that he stopped his car because Lucas came running out into the yard and saying, "[B]ring it on, little pussy, come on, come on." Jeremy testified that Lucas "kept going, [']bang, you're dead, bang, you're dead.[']" Jeremy said that he got scared, turned around and started to return to his truck, and Lucas called him "a

pussy." Jeremy stated that he went to the edge of the Benjamins' property but that he never set foot in their yard. Jeremy testified that his father, Terry, eventually showed up and quietly asked him to get into his truck. Jeremy said he went to Terry's truck and Terry said, "[C]ome on, let's go home."

Jeremy stated that Lucas brought his dog outside and kept laughing as he told the dog to "sick [sic] him, boy, sick [sic] him." Jeremy testified that he was not related to Lonna, Luke, or Larry.

On cross-examination, Jeremy said Terry had to persuade him to leave the Benjamins' property. He said he was very angry and not ready to leave. Jeremy said that he was begging Lucas to come out for a fight. Jeremy said, "I'm going to tell you why I was beggin [sic] him to come out to the road. When you show up at somebody's house walking toward them and they act like they've got a gun, [']bank [sic] your dead, bank [sic] your dead,['] wouldn't that upset you?" He said, "When I started walking back, I didn't know what was going to happen. When you have a guy calling you names, [']pussy, faggot,['] whatever was said, it does flare the temper a bit."

On redirect examination, Jeremy testified that he did not originally go to Lucas's house looking for a fistfight but instead wanted to see if his sister Tara was safe. During the hearing, no evidence or testimony was presented by either party

as to where Tara was located after she left the bar that evening.

During closing arguments, defense counsel again contended no family relationship existed among the parties.

The trial court issued a plenary order of protection against Jeremy and denied the order against Terry. The court disagreed with defendants, finding a sufficient relationship existed for the issuance of an order of protection based on the fact Jeremy was the brother and Terry was the father of plaintiff's son's ex-wife, Tara. The court stated:

> "Certainly ex-relationships are as protected
> as existing relationships, at least according
> to the language of the Order of Protection
> Act. This certainly seems to me to be a case
> where that relationship should apply and
> where an order of protection should enter if
> there were sufficient factual bases to
> support it."

The court concluded the evidence was sufficient to grant an order of protection for one year against Jeremy only, as Terry's actions were reasonable under the circumstances. The court issued a written order of protection against Jeremy effective until 9 a.m. on August 31, 2007.

On September 22, 2006, Jeremy filed a motion to reconsider the trial court's order, again asserting no family

relationship existed.  Also on September 22, 2007, Terry filed a motion for sanctions pursuant to Supreme Court Rule 137, asserting, inter alia, plaintiff filed her petition for an order of protection knowing she had no family relationship with him. 155 Ill. 2d R. 137.  After a joint January 2007 hearing, the trial court denied both of the motions.  Jeremy (No. 4-07-0080) and Terry (No. 4-07-0079) appealed, and we consolidated the appeals.

## II. ANALYSIS

### A. Lack of Appellee Brief

Plaintiff has not filed a brief on appeal.  A reviewing court is not compelled to serve as an advocate for the appellee and is not required to search the record for the purpose of sustaining the trial court's judgment.  However, if the record is simple and the claimed errors are such that the reviewing court can easily decide them without the aid of an appellee's brief, that court should decide the merits of the appeal.  On the other hand, "if the appellant's brief demonstrates prima facie reversible error and the contentions [in] the brief find support in the record," the trial court's judgment may be reversed. First Capitol Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976).

### B. Order of Protection

Since the order of protection against Jeremy has

- 11 -

expired on its own terms on August 31, 2007, we must begin by addressing whether the doctrine of mootness applies to Jeremy's challenge to the order.  An issue raised on appeal becomes moot when the issue no longer exists due to events occurring after the filing of appeal that make it impossible for the appellate court to grant effective relief.  Lutz v. Lutz, 313 Ill. App. 3d 286, 288, 728 N.E.2d 1234, 1236 (2000).  Even assuming the order of protection's expiration rendered Jeremy's issue formally moot, we find his issue reviewable under the public-interest exception to the mootness doctrine.  See Lutz, 313 Ill. App. 3d at 288, 728 N.E.2d at 1236 (applying the exception to an expired order of protection).

Jeremy asserts the order of protection entered against him should be vacated because he is not "a family or household member" of plaintiff.  Jeremy's issue is a matter of statutory interpretation, which presents a question of law; and thus our review is de novo.  People v. Palmer, 218 Ill. 2d 148, 154, 843 N.E.2d 292, 296 (2006).

In interpreting statutes, courts seek to ascertain and give effect to the legislature's intent.  A court begins by examining the statute's language.  The words are given their plain and commonly understood meanings as viewed, not in isolation, but in light of the statute's other relevant provisions.  When a statute's language is clear and unambiguous,

it will be given effect without resort to statutory-construction tools.  State Board of Elections v. Shelden, 354 Ill. App. 3d 506, 512, 821 N.E.2d 698, 704 (2004).  This case involves the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 through 401 (West 2006)), which contains a provision regarding construction (750 ILCS 60/102 (West 2006)).  The Domestic Violence Act, by its very language, was intended to be applied broadly.  The Domestic Violence Act states that it "shall be liberally construed and applied to promote its underlying purposes," which the legislature then lists.  750 ILCS 60/102 (West 2006).  The first purpose of the Domestic Violence Act is as follows:

> "(1) Recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra[]family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development[.]"  750 ILCS 60/102(1) (West 2006).

If the trial court finds the plaintiff "has been abused by a family or household member," then the Domestic Violence Act

- 13 -

provides that "an order of protection prohibiting that abuse, neglect, or exploitation shall issue."  750 ILCS 60/214(a) (West 2006).  Section 103(6) of the Domestic Violence Act (750 ILCS 60/103(6) (West 2006)) defines "'[f]amily or household members'" as including the following:

> "spouses, former spouses, parents, children, stepchildren[,] and other <u>persons related by</u> blood or by present or <u>prior marriage</u>, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, persons who share or allegedly share a blood relationship through a child, persons who have or have had a dating or engagement relationship, persons with disabilities and their personal assistants, and caregivers as defined in paragraph (3) of subsection (b) of [s]ection 12-21 of the Criminal Code of 1961 [(720 ILCS 5/12-21(b)(3) (West 2006))]."  (Emphases added.)  750 ILCS 60/103(6) (West 2006).

The specific statutory language at issue in this case is the language "other persons related by blood or by present or prior marriage."  750 ILCS 60/103(6) (West 2006).  In the present case, Lonna's son, Lucas, was formerly married to Jeremy's sister,

- 14 -

Tara.  Jeremy is, therefore, clearly Lucas's former brother-in-law.  Jeremy is then Lonna's former daughter-in-law's brother.  Terry's relationship to Lonna is Lonna's son's former father-in-law.

Jeremy and Terry argue that these relationships were not intended to be included in the language of the Domestic Violence Act.  They argue that "related by marriage" is commonly understood to mean one's "in-laws," such as father-in-law, mother-in-law, sister-in-law, brother-in-law, son-in-law, and daughter-in-law.  See Gary-Wheaton Bank v. Meyer, 130 Ill. App. 3d 87, 93, 473 N.E.2d 548, 553 (1984) (noting the defendant was "related by marriage" to his mother-in-law).

"Related by marriage" is synonymous with "related by affinity."  See, e.g., Merriam-Webster's Collegiate Dictionary 1050 (11th ed. 2003) ("relative *** a person connected with another by blood or affinity").  There are degrees of affinity.  "Direct affinity" is "[t]he relationship of a spouse to the other spouse's blood relatives," such as "a wife and her husband's brother."  Black's Law Dictionary 63 (8th ed. 2004).  "Collateral affinity" is "[t]he relationship of a spouse's relatives to the other spouse's blood relatives," such as a "wife's brother and her husband's sister."  Black's Law Dictionary 63 (8th ed. 2004).

The relationship between Lonna and Jeremy and Lonna and Terry is not fortuitous.  These parties were relatives by virtue

- 15 -

of Lucas and Tara's prior marriage.  Therefore, Jeremy and Terry were Lonna's relatives by collateral affinity.

Pratt v. Lasley, 213 S.W.3d 159, 160 (Mo. App. 2007), supports this statutory interpretation.  In Pratt, the court concluded that two men who were married to sisters were related by secondary affinity such that one could obtain an order of protection against the other.  Pratt, 213 S.W.3d at 160.  No direct affinity existed in that case.  The defendant argued that while he was related by marriage to his wife's sister, he was not related by marriage to her sister's husband.  Pratt, 213 S.W.3d at 160.  Nevertheless, "collateral affinity" existed, and the court, quoting Black's Law Dictionary, held that an order of protection was properly granted.  Applying that logic to the present case, any of Lucas's siblings could have obtained an order of protection against any of Tara's blood relatives, including her father, Terry, and her brother Jeremy.  Lucas's mother should be allowed to do so also, as the same degree of relationship is present.

Such a liberal interpretation of "persons related by prior marriage" is supported by section 102 of the Domestic Violence Act, which states, "This Act shall be liberally construed and applied to promote its underlying purposes."  750 ILCS 60/102 (West 2006).  One of those stated purposes is to prevent escalating intrafamily violence.  Certainly, the present

case commenced as a result of escalating intrafamily violence that included not only the formerly married couple, Lucas and Tara, but also their siblings and parents. Based on this stated purpose of the Domestic Violence Act, the relationship between Jeremy, Terry, and Lonna, which resulted from the marriage of their immediate family members, is precisely one type of relationship the Domestic Violence Act was intended to address.

Because the Domestic Violence Act provides for a liberal construction of the term "family member," courts should recognize brothers and parents of two formerly married people as included in the term "family member" or "persons related by *** prior marriage." Moreover, as applied in this case, inclusion of siblings and parents of formerly married spouses as "family members" promotes the Domestic Violence Act's stated purpose of eliminating intrafamily violence. Therefore, we affirm the order of protection entered against him.

## C. Rule 137 Sanctions

Terry contends the trial court erred by denying his Rule 137 motion for sanctions because plaintiff falsely pleaded a family relationship existed between them when one did not.

The decision whether to impose sanctions under Rule 137 rests within the trial court's sound discretion, and a reviewing court will not overturn that decision unless the trial court has abused that discretion. Dowd & Dowd, Ltd. v. Gleason, 181 Ill.

- 17 -

2d 460, 487, 693 N.E.2d 358, 372 (1998). A trial court abuses its discretion when no reasonable person could take the view it adopted. Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp., 315 Ill. App. 3d 238, 244, 732 N.E.2d 1129, 1134 (2000).

This court has held Rule 137 (155 Ill. 2d R. 137) sanctions may be granted under the following circumstances:

> "(1) if either party files a pleading or motion that to the best of the attorney's 'knowledge, information, and belief' is not 'well grounded in fact' and is not 'warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law,' or (2) if the pleading or motion is interposed to 'harass or to cause unnecessary delay or needless increase in the cost of litigation.'" (Emphasis omitted.) Miller v. Bizzell, 311 Ill. App. 3d 971, 976, 726 N.E.2d 175, 179 (2000), quoting 155 Ill. 2d R. 137.

We disagree with Terry that he and plaintiff were not family members related by a prior marriage. Therefore, plaintiff's argument was not only a good-faith interpretation of the Domestic Violence Act as demonstrated by the trial court's

concurrence with her interpretation but also a successful one. Accordingly, we find the trial court did not abuse its discretion by denying Terry's Rule 137 motion.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgments.

No. 4-07-0079, Affirmed.

No. 4-07-0080, Affirmed.

COOK, J., concurs.

TURNER, J., specially concurs in part and dissents in part.

JUSTICE TURNER, specially concurring in part and dissenting in part:

While I concur in the majority's conclusion the trial court did not abuse its discretion by denying Terry's Rule 137 motion (No. 4-07-0079), I respectfully dissent from its affirmation of the trial court's order of protection against Jeremy (No. 4-07-0080).

I fully appreciate the majority's desire to uphold one of the Domestic Violence Act's stated purposes "to prevent escalating intra[]family violence." Nonetheless, there must be some set parameters to determine when and if people are related by marriage.

As defendants note, "related by marriage" is commonly understood to mean one's "in-laws," such as father-in-law, mother-in-law, sister-in-law, brother-in-law, son-in-law, and daughter-in-law. See Gary-Wheaton Bank, 130 Ill. App. 3d at 93, 473 N.E.2d at 553 (noting the defendant was "related by marriage" to his mother-in-law). The term "in-law" is defined as "a relative by marriage." Black's Law Dictionary 802 (8th ed. 2004); Merriam-Webster's Collegiate Dictionary 644 (11th ed. 2003). Thus, the language of the statute is almost identical to the definition of "in-law." Clearly, Jeremy is Lucas's former brother-in-law, but none of the aforementioned "in-law" terms would apply to Lonna's relationship to Jeremy. Similarly, Terry

is Lucas's former father-in-law, but again none of the aforementioned terms would apply to Lonna's relationship to Terry. I agree with defendants, no commonly understood term describes the relationship between a parent and his or her child's in-laws. Additionally, a parent's child's in-laws are not commonly understood to be the parent's relations by marriage, just the child's. Thus, I conclude Lonna's relationship to Jeremy and Terry does not fall under the plain and ordinary meaning of "related by *** prior marriage." 750 ILCS 60/103(6) (West 2006).

The majority reaches the opposite result, finding Jeremy and Terry were Lonna's "relatives by collateral affinity." The majority's analysis is flawed for several reasons. First, the statute does not use the term "relatives by collateral affinity," and it is not this court's function to insert terminology into the statute the legislature did not see fit to include. See In re Minor Child Alexis Stella, 353 Ill. App. 3d 415, 417, 818 N.E.2d 824, 826 (2004) ("We cannot read words into a statute that are not there"). The crux of this case is the plain and ordinary meaning of "related by *** prior marriage." 750 ILCS 60/103(6) (West 2006).

Second, although I question the majority's conclusion "'related by affinity'" is synonymous with "'related by marriage,'" even if it is true, "affinity" is usually described

as the relationship that the majority refers to as "direct affinity" (see slip op. at 14). Black's Law Dictionary defines "affinity" as "[t]he relation that one spouse has to the blood relatives of the other spouse; relationship by marriage." Black's Law Dictionary 63 (8th ed. 2004). Moreover, Black's Law Dictionary provides the following definition for "relative by affinity": "A person is a relative by affinity (1) to any blood or adopted relative of his or her spouse, and (2) to any spouse of his or her blood and adopted relatives." Black's Law Dictionary 1315 (8th ed. 2004). While Lucas's prior relationship to Terry and Jeremy would fall under the aforementioned definitions of affinity and direct affinity, Lonna's relationship to defendants as Lucas's mother clearly does not.

Third, even if we look to degrees of affinity, the majority fails to expressly note the term "secondary affinity." "Secondary affinity" is "[t]he relationship of a spouse to the other spouse's marital relatives," such as "a wife and her husband's sister-in-law." Black's Law Dictionary 63-64 (8th ed. 2004). Contrary to the majority's suggestion (see slip op. at 14-15), "secondary affinity" is its own term separate from the term "collateral affinity." Moreover, on the facts of this case, secondary affinity would describe Lucas's relationship to the spouses of Tara's siblings and Tara's relationship to the spouses of Lucas's siblings, not the relationship between Lucas's

siblings and Tara's blood relatives as implied by the majority (see slip op. at 15).

Last, I disagree the <u>Pratt</u> case supports the majority's interpretation of the statute. While the <u>Pratt</u> court noted the parties in that case were related by secondary affinity, it mentioned that term in rejecting the defendant's assertion "related by marriage" should be limited to relatives by blood or direct affinity based on the definition of the term "of kin." See <u>Pratt</u>, 213 S.W.3d at 160, 160 n.2. In actually interpreting the statute, the <u>Pratt</u> court looked to the plain and ordinary meaning of "related by marriage" and found that term included one's brother-in-law. <u>Pratt</u>, 213 S.W.3d at 160. Then citing the definition of "brother-in-law," the <u>Pratt</u> court found the defendant and the plaintiff, who were married to sisters, were brothers-in-law and therefore their relationship fell under the order-of-protection statute. <u>Pratt</u>, 213 S.W.3d at 160, citing Black's Law Dictionary 194 (6th ed. 1990); Webster's Third New International Dictionary 284 (1993). Thus, the <u>Pratt</u> court did not look to such terms as direct, secondary, and collateral affinity in interpreting "related by marriage," but rather looked to the commonly understood meaning of the term. Moreover, even if it is proper to consider degrees of affinity in interpreting "related by marriage," the <u>Pratt</u> case still does not support the majority's conclusion because it involved secondary affinity, not

- 23 -

the more distant collateral affinity at issue in this case.

As previously indicated, I agree with the majority's conclusion the trial court did not abuse its discretion by denying Terry's Rule 137 motion. While I agree with Terry that he and Lonna were not family members related by a prior marriage since they were not "in-laws," Lonna's argument was a good-faith interpretation of the Domestic Violence Act as demonstrated by the trial court's ruling and by the majority position taken today.