NO. 4-07-0192

Filed 6/26/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JAMES FRANK, | ) | Appeal from |
| Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| BRENT D. HAWKINS, | ) | No. 07OP7 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Lisa Holder White, |
| | ) | Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In January 2007, petitioner, James Frank, filed a petition for an emergency order of protection on behalf of his children, Donovan and Hayli Frank, requesting that the trial court enter the order against respondent, Brent D. Hawkins, who shared a common household with petitioner's children. The court entered an emergency order of protection. In February 2007, the court entered a plenary order of protection (order) against respondent. Respondent appeals the entry of the order. We affirm entry of the order but remand with directions that the order be corrected on its face.

I. BACKGROUND

In January 2007, petitioner filed a petition for an emergency order of protection on behalf of his children, Donovan Frank, age 14, and Hayli Frank, age 10. In the form petition, petitioner checked the box indicating that the relationship between the children and respondent was "shared/common dwelling."

An attachment indicated that the petition for the emergency order of protection stemmed from an incident that occurred late at night on December 21, 2006, at the home of Donovan, Hayli, their mother Ronette Frank (Ronette), and respondent. Respondent allegedly destroyed the Christmas tree, broke many items in the house, and threatened to kill the family pets. The petition also alleged that the children were frightened of respondent. Additionally, the petition stated that respondent had other orders of protection against him which he had violated, he had previous battery charges on his record, and he had pleaded guilty to domestic battery of Ronette in 2000.

On January 3, 2007, petitioner appeared for an ex parte hearing on the petition for an emergency order of protection. He testified that respondent was Ronette's boyfriend and Ronette was the mother of Donovan and Hayli. The trial court entered an emergency order of protection. The form order indicated that the petition was being brought by petitioner on behalf of the "[c]hild(ren) as noted on page 6, [p]art C of this order." The jurisdiction section of the form order indicated that the persons protected by the order were "[m]inor child(ren) who are so identified on page 6 of 11, [p]art C of this order" and that the court had jurisdiction over the minor children. The general findings section of the form order indicated that "[t]he [r]espondent has abused the [p]etitioner and/or the child(ren) so identified in [p]art C (page 6 of 11) of this order and/or the protected person(s)." No names are written in part C of the

- 2 -

order. Summons was served on respondent on January 3, 2007. The summons reflected the action was brought on behalf of Donovan Frank and Hayli Frank.

In February 2007, a hearing was held to determine whether a plenary order of protection would be entered. Respondent testified that up until entry of the January 2007 emergency order of protection, he had lived at 708 East Van Buren with Ronette, Donovan, and Hayli. Respondent acknowledged that previously three orders of protection had been entered against him by three different people. Respondent did not recall having pleaded guilty to three violations of orders of protection. He acknowledged that he had pleaded guilty to a 2000 domestic battery committed against Ronette. Respondent did not believe the children had been present when he had battered Ronette. Respondent denied ever holding a knife to Ronette's throat. He admitted he had a misdemeanor theft conviction.

On December 21, 2006, respondent stopped by a bar on his way home from work. Ronette was not home when he arrived home. She and the children arrived home several hours later. Respondent was asleep on the couch when they got home and claimed he stayed asleep the rest of the evening. They did not speak that night because he was asleep.

Respondent denied he "trashed" the upstairs (main floor) of the house. Respondent claimed he fell into the Christmas tree while he was trying to get his change jar off the mantel behind the tree. Respondent slipped in the cords, tried to grab

- 3 -

the tree to catch himself, and the tree fell apart. Respondent admitted he was a "little upset" by the tree falling. Respondent knocked over the television. The television fell onto a vase and broke it. Respondent did not pick up anything because he was tired and it was a big mess. He planned to pick it up the next day. Respondent denied smashing the dishes and dishware in the kitchen.

Respondent called Ronette's grandmother's house around 10:30 or 11 p.m., but Ronette was not there. Respondent denied that he threatened to kill the pit bull dog that night. He admitted having done so on a previous occasion three or four weeks before December 21, 2006.

Respondent denied having "trashed" the basement of the house that evening. Respondent denied having destroyed anything when Ronette and the children were there. He stated that the only thing that was broken was the vase and that the tree had been knocked over. Respondent denied yelling at, swearing at, or threatening the children that night. Respondent stated he had never laid a hand on Donovan or Hayli.

Ronette testified that her address was 708 East Van Buren, Decatur, Illinois. She is the mother of Donovan and Hayli. She is divorced from petitioner. Ronette maintained that respondent is Hayli's father but that in the divorce proceedings petitioner was named the father of both children. Ronette and respondent had been together going on 12 years, and they had been together for a solid 7 years.

- 4 -

Ronette denied ever having an order of protection against respondent.  Ronette did not recall having been the victim of domestic battery at the hands of respondent in 2000.  She remembered an argument that resulted in the police being called, but she did not recall that respondent pleaded guilty to domestic battery.  Ronette maintained that respondent had never abused her, hit her, or laid a hand on her.  Ronette denied that respondent drank or came home drunk.

Regarding the incident on December 21, 2006, shortly after 9 p.m. Ronette picked up her children from petitioner's house and took them to her grandmother's while she went to finish up her Christmas shopping.  At approximately 12:30 a.m., Ronette went to the house to drop off the presents she had purchased.  When she arrived home, she noticed that the Christmas tree was all messed up.  No furniture was knocked over.  Respondent was asleep on the couch so she did not talk to him.  Ronette put the gifts in Donovan's bedroom and left to pick up the children.  They arrived back home about 1 a.m.

Ronette denied receiving a phone call from respondent after she returned to her grandmother's or that respondent had threatened to kill the pets if she did not get home.  Ronette thought her grandmother may have received a call from respondent inquiring if she was there to get the children.

When Ronette arrived back home with the children, the house was in the same condition.  Respondent was still asleep on the couch, so she nudged him and asked what had happened to the

tree.  He said something about getting caught up in the cords, and grabbing hold of the tree, and coming down with it.  Ronette said she would worry about it in the morning.  The house had only two bedrooms, one for Donovan and one for Hayli.  Respondent slept on the couch when the children were there and Ronette slept on another couch.  When the children were gone, sometimes Ronette slept in Donovan's room because she got tired of sleeping on the couch.  Ronette stated that the basement was where the dogs stayed and where the laundry room was located.  The basement was a mess with unpacked boxes.  They rarely went down into the basement.  Ronette and the children went to bed in Hayli's room.  Ronette maintained that was because she had hidden the Christmas presents in Donovan's room.  Ronette claimed she did not sleep on the other couch because she did not want to step on any of the debris from the Christmas tree if she got up to use the bathroom in the middle of the night.

Ronette denied getting into an argument with respondent or that she went down in the basement with him.  Ronette further maintained that respondent had not done any damage to the base-ment of the house later that night.

Ronette testified that respondent had never laid a hand on either of the children.  She stated that she had never seen respondent hit, push, or use the belt on the children.  Ronette denied offering her children money and to buy them things in exchange for their false testimony at the hearing.  She testified that her son lies to her, has behavioral problems, and gets into

trouble.

Virginia Spires testified that she is Ronette's grandmother. On the evening of December 21, 2006, Spires watched the children while Ronette finished her Christmas shopping. Ronette dropped the children off around 9 p.m. and returned around 12:30 a.m. During that time period, respondent called to inquire if Ronette had been there to pick up the children. Spires did not speak to respondent again that evening. Spires testified that when Ronette came to pick up the children, Ronette did not say anything about respondent messing up the Christmas tree or destroying items in the house.

Donovan and Hayli Frank were called to testify by petitioner. At the request of petitioner's counsel, and without objection by defense counsel, the testimony was given in chambers with only the judge and attorneys present.

Donovan testified that he was 14 years old and was in the eighth grade. He attended Thomas Jefferson Middle school. Donovan lived at his father's house every Monday, Thursday, and every other weekend. The rest of the time he lived at his mother's house along with his sister Hayli and respondent.

Late on December 21, 2006, Donovan was at his grandmother's (technically great-grandmother's) house because his mother was out Christmas shopping. Before Ronette came to pick up Donovan, she stopped by their house to tell respondent she was done Christmas shopping and was going to go pick up the children. When Ronette arrived at her grandmother's house, she was crying.

Ronette told them that the house "was destroyed." She said that the Christmas tree had been thrown and the entertainment center had been broken.

Before they left their grandmother's house, respondent called five times. Respondent apparently told Ronette she needed to hurry up and get home or he was going to kill their pets because Donovan heard Ronette say, "[y]ou better not kill my dog, or I'll call the cops on you." When they arrived home, respondent was acting like he was asleep. According to Donovan, the television had been thrown into his room from the living room, the entertainment center had been broken, candles that had been on a table were all over the floor, and a glass-topped table had been thrown across the room bending the frame. In the hallway, a box of screws had been thrown so screws were everywhere. The computer mouse and keyboard had been thrown and the keyboard had been broken. Papers had been thrown on the floor. In the kitchen, glasses, bowls, plates, and the coffee pot had been smashed on the floor. A small compact disc player had also been broken in the kitchen.

Donovan, Hayli, and Ronette went into Hayli's bedroom and went to bed. All three of them went into Hayli's bedroom because Ronette was afraid that if Donovan went in his own room to sleep respondent would "mess with" him.

About 20 minutes later, respondent started yelling at them and calling Ronette a "cheater." Respondent went down to the bedroom in the basement, and they heard "stuff being thrown

down there." At Ronette's request, Donovan went down to the basement to peek at what respondent was doing. Donovan saw respondent pull out the dresser drawers and search them. Donovan saw respondent throw the mattress to Ronette's bed across the room. Respondent knocked over the vanity. Donovan went upstairs and told Ronette what respondent was doing. Ronette went down to the basement. She and respondent argued.

The next morning, Ronette and Donovan got up and cleaned the upstairs. Respondent cleaned up the basement. Respondent did not want her to leave and things escalated into an argument. Respondent said he had been looking for any letters Ronette may have received from her ex-boyfriend since respondent had come back to live with them.

Donovan stated that when he was younger he was a "bad kid" and got into trouble a lot. Respondent disciplined Donovan, including whipping Donovan with respondent's hands or a belt. Donovan had not been in trouble recently so respondent had not meted out any discipline. Donovan stated that Hayli was "the good kid," and respondent did not spank her.

Donovan said Ronette promised him that she would pay him $100, buy him a "PS 3 [PlayStation 3]," and buy him minutes on his cell phone if he would lie to the judge and say that respondent never destroyed the house, took them out to eat all the time, never went out drinking, and never came home drunk. However, Donovan stated that respondent got drunk every day and in the past three months had taken them out to eat about four

times.

Donovan admitted having spoken with defense counsel on an occasion prior to the hearing. He admitted that he had previously told defense counsel that respondent never hit or yelled at anyone.

Hayli testified that she was 10 years old and lived at 708 East Van Buren Street. She attended South Shores Elementary school. Hayli lived with her mother most of the time but had a regular schedule of living some of the time with her father. Others who lived in her mother's house were Donovan and respondent. Respondent had lived with them when Hayli was younger and then had moved back in a few months ago.

When Hayli was younger, respondent had spanked her. She had also seen respondent hit Donovan with a belt and spank him.

Hayli stated that right before Christmas, respondent had "supposedly" messed up or "trashed" the house. Hayli explained that she said "supposedly" because most of the damage had occurred while she was at her grandmother's (technically great-grandmother's) house. On the evening of the damage, Ronette told Hayli that respondent had destroyed items in the house. However, the next day Ronette said she herself may have done so. Ronette told Hayli that respondent said he was going to kill the animals.

Respondent was asleep on the couch when they got home. Hayli thought that respondent was really faking being asleep and acting like nothing had happened. Hayli, Donovan, and Ronette

went up to Hayli's bedroom shortly after they arrived home. As they were falling asleep, Hayli heard respondent go down into the basement where Ronette had her bedroom and heard him throwing things around and tearing the drawers out of her mother's dresser. Donovan saw respondent tearing up the basement. A few minutes later, Ronette went down to the basement. Before she went down to the basement, she told the children "'[i]f you hear me scream, then call the cops.'" Ronette and respondent argued in the basement.

The next morning, Hayli saw the damage that had been done upstairs. Glass was all over the place. A glass picture that had been in the kitchen was broken, a stand that held cans in the kitchen had been knocked over, the keyboard and other "stuff" had been knocked over, papers from the computer desk were all over the place, the computer desk chair had been knocked over, and the Christmas tree had been knocked over and torn apart.

The day before the hearing, Ronette had promised to (1) give Hayli $100, (2) buy her a cell phone, and (3) give her permission to go out and buy whatever she wanted if she would testify that nothing bad had happened and that respondent had not done anything except trip over the Christmas tree.

The trial court admitted petitioner's exhibit No. 2 into evidence. The exhibit contained the information charging respondent with domestic battery against Ronette on or about July 6, 2000, and a copy of the August 8, 2000, docket entry indicat-

ing respondent's guilty plea to that charge.

After hearing arguments of counsel, the trial court stated:

> "We'll show witnesses sworn.  Evidence heard.
> [Defense counsel] is correct in that, of
> course, the [c]ourt does have to first make a
> finding that there is some abuse, and at
> times there is a misconception that there has
> to be actual physical abuse, that someone has
> to be hit or struck or something of that
> nature, but the [c]ourt believes that the
> statute is clear in that it's not appropriate
> and it is harassment and abuse for an indi-
> vidual to be subjected to treatment that's
> been described here in terms of coming home
> and finding your house in disarray or being
> threatened that your animals will be hurt if
> you don't come home, someone repeatedly com-
> ing to the home intoxicated and yelling and
> causing a disruption.  All those things con-
> stitute abuse and harassment, and the [c]ourt
> does find that the testimony of the minor
> child, Hayli, was credible.  There has been
> no one who's questioned her credibility.
> There's been no testimony regarding her hav-
> ing problems with telling the truth or being

in trouble or anything of that nature, and so the [c]ourt does find that the petitioner has sustained his burden of proof.  The prayer of the petition is granted."

The trial court entered the written order.  The form order indicated that it was being brought by petitioner on behalf of "[c]hild(ren) as noted on page 6, [p]art C of this order." The jurisdiction section of the form order indicated that the persons protected by the order were petitioner and "the [m]inor child(ren) identified in [p]art C, (page 6 of 13) of this order" and that the court had jurisdiction over "the minor child(ren) and/or other protected persons."  The general finding section of the form order indicated that "[r]espondent has abused the [p]etitioner and/or the child(ren) so identified on [p]art C (page 6 of 13) of this order and/or the protected person(s) listed on [p]age 1 of 13 of this order."  No names are written in part C of the order.

The order prohibited respondent from committing acts of abuse or threats of abuse against "all protected persons," including harassment, interference with personal liberty, physical abuse, stalking, intimidation of a dependent, willful deprivation, neglect, and exploitation.  Further, respondent was ordered to stay 100 feet away from "[p]etitioner and/or other protected person(s)," stay 500 feet away from the residence of "[p]etitioner and/or other protected person(s), currently located at 708 [East] Van Buren, Decatur, [Illinois], while children are

present."  Respondent was prohibited from "entering or remaining while [p]etitioner and/or protected person(s) is/are present at: *** [t]heir school, located at Thomas Jefferson, Decatur, [Illinois], So[uth] Shores, Decatur, [Illinois]."  Respondent was also prohibited from entering or remaining in the residence or household while under the influence of drugs or alcohol and constituting a threat to the safety or well-being of petitioner or petitioner's children.

The docket entry for the hearing on the order stated:

"Cause called for hearing on the request for [p]lenary [o]rder of [p]rotection.  Witnesses sworn, evidence heard.  Motion by the [r]espondent for directive [sic] finding at the close of the [p]etitioner's evidence.  Arguments of counsel heard.  Motion denied. ***  Petitioner's exhibit [No.] 2 admitted into evidence.  Witnesses sworn.  Evidence heard to conclusion.  Finding by the [c]ourt that the [p]etitioner has sustained his burden of proof.  Prayer of the [p]etition granted.  Order entered and extended for two years."

The circuit clerk certified she mailed a copy of the order to respondent on February 9, 2007.  This appeal followed.

## II. ANALYSIS

Respondent appeals entry of the order, arguing that (1)

- 14 -

the order of protection as entered failed to comply with statutory requirements, (2) the trial court's finding of abuse was against the manifest weight of the evidence, and (3) the trial court abused its discretion in entering the order of protection.

## A. No Appellee Brief Was Filed

Petitioner has failed to file a brief on appeal. "A reviewing court is not compelled to serve as an advocate for the appellee and is not required to search the record for the purpose of sustaining the trial court's judgment." Benjamin v. McKinnon, 379 Ill. App. 3d 1013, 1019, 887 N.E.2d 14, 19 (2008). "However, if the record is simple and the claimed errors are such that the *** court can easily decide them without the aid of an appellee's brief, [the] court should decide the merits of the appeal." Benjamin v. McKinnon, 379 Ill. App. 3d at 1019, 887 N.E.2d at 14. On the other hand, if the appellant's brief demonstrates prima facie reversible error and the contentions in the brief find support in the record, the trial court's judgment may be reversed. First Capitol Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976).

## B. The Domestic Violence Act Is To Be Liberally Construed

In the text of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/102 (West 2006)), the legislature specifically provides the Act's provisions are to be liberally construed to "promote its underlying purposes." The Act states:

"This Act shall be liberally construed
and applied to promote its underlying pur-

- 15 -

poses, which are to:

(1) Recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development;

\* \* \*

(4) Support the efforts of victims of domestic violence to avoid further abuse by promptly entering and diligently enforcing court orders which prohibit abuse and, when necessary, reduce the abuser's access to the victim and address any related issues of child custody and economic support, so that victims are not trapped in abusive situations by fear of retaliation, loss of child, financial dependence, or loss of accessible housing or services[.]"  750 ILCS 60/102(1), (4) (West 2006).

C. The Record Supports the Conclusion That the
     Trial Court Intended the Children To Be
          Protected Parties Under the Order

Respondent argues that the order entered in this case

- 16 -

failed to comply with the statutory requirements of the Act. First, respondent argues that the trial court's failure to check certain boxes on page one of the form order left the court's intentions unknown regarding whether respondent was (1) prohibited from committing further acts of abuse or threats of abuse, or (2) to stay away from petitioner and other protected persons.

Second, respondent argues that the "fatal defect" in the order was its failure to comply with the requirements of section 221(b)(1) of the Act requiring that an order of protection shall state "[t]he name of each petitioner that the court finds was abused, neglected, or exploited by respondent, and that respondent is a member of the family or household of each such petitioner, and the name of each other person protected by the order and that such person is protected by this Act."  750 ILCS 60/221(b)(1) (West 2006).

Because nowhere in the order entered in this case are petitioner's children identified specifically by name as protected persons under the order, respondent maintains that the only protected person who was identified within the order of protection is petitioner, James Frank, and that the record does not support entry of an order for petitioner.

Third, respondent argues that reversal of the order is required because the order "cannot be appropriately amended or corrected or 'fixed' on remand."  Respondent maintains this is because the record is insufficient to establish or to "constitute a memorandum" (1) of what remedies the trial court intended to

grant, or (2) that the court exercised the judgment and judicial discretion necessary to determine the appropriate remedies or prohibitions to incorporate into the order.  We disagree.

The duty of the reviewing court is to "consider the trial record as a whole and to ignore errors that are harmless." People v. Robinson, 368 Ill. App. 3d 963, 977, 859 N.E.2d 232, 247 (2006).  When reviewing the record as a whole in the case sub judice, clearly the persons to be protected by these proceedings are Donovan and Hayli Frank.  Clearly, the trial court intended that respondent be prohibited from committing further acts of abuse or threats of abuse against Donovan and Hayli and that respondent stay away from Donovan and Hayli.  The emergency order of protection entered and served on respondent on January 3, 2007, listed 708 East Van Buren Street as respondent's address and also the children's address.  The order specifically ordered respondent to stay 500 feet away from 708 East Van Buren Street "when children are present" and prohibited him from entering or remaining at the children's respective schools "while [p]etitioner and/or other protected person(s) are present."  The summons served on respondent after entry of the emergency order of protection reflected that the action was brought on behalf of the children.

At the February 2007 hearing on the order, respondent testified that he had lived at 708 East Van Buren until entry of the emergency order of protection.  It can be inferred that he understood that per the emergency order of protection he could

- 18 -

not live at 708 East Van Buren because he could not be around the children who lived there. Moreover, respondent was present at the plenary hearing where the evidence clearly pertained to the children.

In the trial court's statements after hearing the evidence, the court indicated that petitioner had met his burden by a showing that the members of the household, i.e., Donovan and Hayli Frank, had been harassed and abused. Even though the court did not state that the petitioner had met the burden specifically as it related to Donovan and Hayli Frank, it is obvious from the record as a whole that they were the subject of the petition for the order of protection and the persons intended to be protected under the order.

Admittedly, the form order is missing information. However, it contains sufficient information as to the type of remedies the trial court intended to order and, therefore, it is not fatally defective. Within the body of the order, the court checked boxes in the area of "remedies involving personal protection" with respect to all protected persons. The court checked boxes ordering respondent to stay 100 feet away from those protected persons and stay 500 feet away from the residence of those protected persons while those protected persons were present. Further, the court checked boxes prohibiting respondent from entering or remaining at the schools of those protected persons while those protected person were present. The court also checked boxes prohibiting respondent from entering or

- 19 -

remaining in the residence or household of those protected persons while under the influence of drugs or alcohol that would constitute a threat to the safety or well-being of those protected persons.

The preprinted form order is missing information. Such omissions are harmless error and can be corrected ministerially. Therefore, the trial court is advised to amend the order on its face to include the inadvertently omitted check marks on page one under "[t]he court orders," and on page six to set forth specifically the names of Donovan and Hayli Frank as protected parties under the order of protection.

### D. The Trial Court's Findings Were Not Against the Manifest Weight of the Evidence

Respondent next argues that the trial court's findings were against the manifest weight of the evidence. Specifically, respondent maintains that the court's characterization of respondent's conduct as "harassment and abuse" is against the manifest weight of the evidence because (1) the court relied upon the unsworn testimony of Donovan and Hayli; (2) the court relied upon Donovan's testimony, which was "laden with hearsay and was completely impeached by his admissions concerning the statements he had made to [respondent's] attorney," and even though the court contrasted his credibility by noting that Hayli's testimony was "credible"; (3) even if the testimony of Donovan and Hayli was properly considered, neither child (a) testified that they had "suffered or felt any adverse consequences from [respon-

- 20 -

dent's] conduct, or (b) claimed to have been "fearful or fright-ened, anxious, worried[,] or even 'uncomfortable'"; (4) no evidence suggested that respondent "intended for either child to be fearful or frightened, anxious, worried[,] or uncomfortable"; and (5) the children's statements were "inherently suspect" because they were premised upon "the notion that [respondent] was rip-roaring drunk and on a rampage that night, except that he was on the couch, appearing to them to be doing a pretty good job of feigning sleep, a pose he maintained for 20 minutes or more after the children arrived home, and then--like flipping a switch--he was rampaging again."

### 1. Donovan and Hayli Gave Sworn Testimony

The testimony of Donovan and Hayli was taken in chambers in the presence of the State and defense counsel. The record reflects that their testimony was not taken down by a court reporter but was recorded by a system in a control room on another floor of the courthouse. Before ruling on the petition for the order, the trial court noted witnesses were sworn. Further, the docket entry for the order twice indicated that witnesses were sworn. Therefore, the record strongly suggests that the children were sworn before giving their testimony in chambers.

Moreover, respondent was represented by counsel. No objection was made at the hearing about Donovan and Hayli not being sworn. Counsel cannot stand by and permit such an irregular proceeding to take place and then argue such irregularity is

error.  <u>People v. Dahlin</u>, 184 Ill. App. 3d 59, 64, 539 N.E.2d 1293, 1296 (1989).  Counsel cross-examined Donovan and Hayli without reservations.  Consequently, even if it could be determined with certainty that Donovan and Hayli had not been sworn, the issue has been forfeited because of counsel's failure to bring this irregularity to the attention of the trial court.  The court's judgment cannot be reversed on that ground.  <u>Dahlin</u>, 184 Ill. App. 3d at 64, 539 N.E.2d at 1296, citing <u>People v. Krotz</u>, 341 Ill. 214, 220, 172 N.E. 135, 138 (1930).

### 2. <u>The</u> <u>Trial</u> <u>Court's</u> <u>Finding</u> <u>of</u> <u>Abuse</u> <u>Was</u><br><u>Not</u> <u>Against</u> <u>the</u> <u>Manifest</u> <u>Weight</u> <u>of</u> <u>the</u> <u>Evidence</u>

Respondent argues that (1) Donovan's testimony was not credible; and (2) even if the trial court properly considered the testimony of Donovan and Hayli, their testimony did not support the court's finding of abuse of the children by respondent.  The standard of proof in a proceeding under the Act is by a preponderance of the evidence.  750 ILCS 60/205(a) (West 2006).  "When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence."  <u>Best v. Best</u>, 223 Ill. 2d 342, 348-49, 860 N.E.2d 240, 244 (2006).  When reviewing a trial court's decision under the manifest-weight-of-the-evidence standard, courts of review "give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court

cannot possibly obtain." In re D.F., 201 Ill. 2d 476, 498-99, 777 N.E.2d 930, 943 (2002). Therefore, determinations as to the credibility of witnesses, weight of the evidence, and inferences drawn therefrom are uniquely within the province of the trial court, and this court must not substitute our judgment for that of the trial court. In re D.F., 201 Ill. 2d at 499, 777 N.E.2d at 943.

Respondent maintains that neither child testified that they had "suffered or felt any adverse consequences from [respondent's] conduct" nor claimed to have been "fearful or frightened, anxious, worried[,] or even 'uncomfortable.'" The record demonstrates otherwise. Before Donovan began his testimony in chambers, the following colloquy occurred between him and the court:

"THE COURT: I'll tell you what, if you would put him here so that we can pick up his voice.

Good morning.

DONOVAN FRANK: Where's that be?

THE COURT: I'm sorry?

DONOVAN FRANK: Is that being out there?

THE COURT: No. Absolutely not. No.

The reason we have you here is so that--

DONOVAN FRANK: So they can't hear what I'm saying out there?

THE COURT: No, they cannot.

DONOVAN FRANK: All right.

- 23 -

THE COURT: We have a control room here in the courthouse on the sixth floor, and it allows them to record what's going on in here, but not in the courtroom. No one can hear you."

This colloquy permits the inference that Donovan was fearful, frightened, anxious, worried, and uncomfortable about respondent hearing his testimony. The inference could be drawn that Donovan feared reprisal from respondent for testifying against him, fear that was not unwarranted given respondent's violent history.

Respondent further maintains that Donovan's testimony was not credible because it was either impeached by what Donovan had told defense counsel on an earlier occasion, or laden with hearsay. Again, the record shows otherwise. Respondent was represented by counsel who did not raise any objection to the hearsay testimony. The failure to object to hearsay testimony not only constitutes forfeiture of the issue on appeal, "but allows the evidence to be considered by the trier of fact and to be given its natural probative effect." People v. Ramsey, 205 Ill. 2d 287, 293, 793 N.E.2d 25, 29 (2002). Much of Donovan's testimony was corroborated by that of Hayli. Both Donovan and Hayli testified that in the past Donovan had been whipped by respondent with either a belt or respondent's hands. Donovan testified about his own observation of his mother crying on December 21, 2006, when she returned to her grandmother's house to pick up the children. Donovan testified that his mother "told

- 24 -

us that, like, the Christmas tree was thrown and our entertainment center was broke and all that." Hayli testified that her mother told her that respondent had destroyed items in the house; however, the next day her mother said she may have done it. Donovan testified that respondent called his mother while they were still at her grandmother's house. Donovan understood that respondent had told his mother they had better get home quickly or respondent was going to hurt their pets because Donovan heard his mother on the phone say, "[y]ou better not kill my dog, or I'll call the cops on you." Hayli testified that her mother told her respondent threatened to kill the animals.

Donovan testified that when they returned home he observed that the house was in total disarray and many items were broken throughout the living room, hallway, and kitchen. Respondent was, in Donovan's opinion, pretending to be asleep on the couch. Donovan testified that he, his sister, and his mother all went to sleep in Hayli's bedroom because his mother was afraid if Donovan went to his bedroom respondent would "mess with" him. Donovan testified that shortly after they went to bed, he heard respondent yelling at them. Respondent went down to the basement, and Donovan testified they "heard the stuff being thrown down there." Hayli testified that shortly after they got home, she heard respondent go down to the basement and start throwing things around. Hayli stated she did not see what damage respondent did in the basement but Donovan did because he went down and peeked. Donovan testified that he went down to the basement at

his mother's request and witnessed respondent upending the mattress, pulling drawers out of the dresser and rifling through its contents, and knocking over the vanity. Donovan testified that his mother went down to the basement, and Donovan heard them arguing. Hayli testified that as her mother went down to the basement she told the children, "[i]f you hear me scream, then call the cops." Hayli heard her mother and respondent arguing. Donovan testified that the next morning, he and his mother cleaned up the mess. Hayli testified that the next morning she saw all the damage that had been done upstairs with glass everywhere and everything in disarray.

Donovan did admit to defense counsel that he had previously told defense counsel that respondent never yelled or cussed at anyone, never hit him, and that respondent was always nice to him. The trial court could have reasonably inferred that Donovan's apprehension and fear of respondent may have led him to deny being abused by respondent to respondent's own attorney.

Both children testified to the fact that their mother had offered them money and other items if they would testify falsely at the hearing.

"A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." Best, 223 Ill. 2d at 350, 860 N.E.2d at 245. "Abuse" as defined under section 103(1) of the Act means "physical abuse, harassment, intimidation of a dependent, inter-

ference with personal liberty[,] or willful deprivation but does not include reasonable direction of a minor child by a parent or person in loco parentis." 750 ILCS 60/103(1) (West 2006). "Harassment" as defined under the Act "means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2006). "Harassment does not necessarily require an overt act of violence." People v. Whitfield, 147 Ill. App. 3d 675, 679, 498 N.E.2d 262, 265 (1986). The Act recognizes that domestic violence is a serious crime against individuals and society and that domestic violence produces family disharmony and "creates an emotional atmosphere that is not conducive to healthy childhood development[.]" See 750 ILCS 60/102(1) (West 2006).

The evidence presented in the case sub judice supported the trial court's finding of abuse. The testimony of Donovan was corroborated by Hayli's testimony and vice-versa. Ronette's testimony was incredible. Respondent's testimony proved that he has a serious history of violence against others with whom he has had an intimate relationship. During the December 21, 2006, incident, respondent's actions were violent. For the children to come home to find their home in shambles and their personal belongings smashed and thrown around, then to witness and/or hear respondent throwing and destroying things in the basement, and then to see the aftermath of his rampage, could only have led to

- 27 -

an atmosphere of emotional distress and anxiety. Respondent's past history of domestic battery against the children's mother, and respondent's rampage on the evening of December 21, 2006, could only have led the children to fear that more was in store for their mother or even them. Respondent's conduct constituted psychological abuse, harassment, and intimidation.

Moreover, respondent's actions also constituted physical abuse under the Act. Respondent's first rampage of destruction was not enough. He pretended to be asleep as Ronette, Donovan, and Hayli came in the house. They went to bed. Moments later, respondent took up his rampage again and destroyed additional household items by throwing them across Ronette's bedroom and upending her bedroom furniture. The Act defines "physical abuse" to include "knowing or reckless use of physical force, confinement or restraint" and "knowing or reckless conduct which creates an immediate risk of physical harm." 750 ILCS 60/103(14)(i), (iii) (West 2006). Respondent's destructive rampage while the children were present in the home constituted knowing and reckless use of physical force and created an immediate risk of physical harm to Donovan and Hayli. Further, respondent previously abused Donovan physically when he whipped Donovan with his hands and a belt.

The court's finding of abuse in this case was neither unreasonable nor arbitrary, nor was the opposite conclusion clearly evident. Therefore, the court's finding was not against the manifest weight of the evidence.

E. The Trial Court Did Not Abuse Its Discretion
in Entering the Order

Respondent also argues that the trial court abused its discretion in entering the order and in granting the remedies requested.  Respondent maintains that no evidentiary basis supported the finding that "the conduct or actions of the [r]espondent, unless prohibited, will likely cause irreparable harm or continued abuse" based upon respondent's conduct on December 21, 2006.  Regarding the remedies granted, respondent argues that the only remedy supported by the evidence is that which prohibited respondent from "entering or remaining in the residence or household while under the influence of drugs or alcohol and constituting a threat to the safety or well-being of [p]etitioner or [p]etitioner's children."  Respondent maintains that "[a]nything beyond that simple prohibition constitutes 'overkill,' contravenes the specific provisions of the Act, goes without any evidentiary support in the record, and constitutes an abuse of judicial discretion."  Respondent argues the court abused its discretion because the court did not "employ conscientious judgment in the drafting and in the entry of the [o]rder." We disagree.

When a trial court crafts an order of protection after finding abuse, it "acts as a shaper of remedies" and, in that capacity, the court has "true discretion."  Best v. Best, 358 Ill. App. 3d 1046, 1053, 832 N.E.2d 457, 463 (2005).  Therefore, we review the court's granting of remedies in the order of

protection under an abuse-of-discretion standard.

After a finding of abuse, the statute provides that "an order of protection prohibiting the abuse, neglect, or exploitation <u>shall</u> issue" provided that the petitioner also satisfies the requirements of section 219 of the Act relating to plenary orders of protection. (Emphasis added.) 750 ILCS 60/214(a) (West 2006). (Respondent raised no issue whether petitioner satisfies the requirements of section 219 of the Act.)

The Act provides a nonexclusive list of factors that the trial court needs to consider when determining whether to grant specific remedies other than payment of support. They include:

"(i) the nature, frequency, severity, pattern[,] and consequences of respondent's past abuse, neglect[,] or exploitation of the petitioner or any family or household member, including the concealment of his or her location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household; and

(ii) the danger that any minor child will be abused or neglected or improperly removed from the jurisdiction, improperly concealed within the State or improperly

- 30 -

separated from the child's primary caretaker." 750 ILCS 60/214(c)(1) (West 2006).

The best indicator of a person's future conduct is his past conduct. See People v. Henderson, 142 Ill. 2d 258, 339, 568 N.E.2d 1234, 1272 (1990). That maxim applies to judicial functions where a person's future conduct is at issue, such as determining whether to enter an order of protection. In those certain situations, the trial court is free to consider a respondent's past conduct. Therefore, once the court found abuse, its duty was to determine whether petitioner or others protected under the Act were in need of future protection, and in doing so, the court was free to consider respondent's past acts.

As noted previously, respondent's conduct on December 21, 2006, clearly constituted abuse under the Act. Respondent had a history of domestic violence against the children's mother and had used the belt on Donovan, other orders of protection had been entered against him, and he had violated those orders of protection. In accordance with the stated purpose of the Act to support victims of domestic violence and avoid further abuse, once the trial court found respondent had abused the children, the court did not abuse its discretion in finding that (1) unless prohibited from doing so, respondent would likely cause irreparable harm or continued abuse, and (2) it was necessary to grant the relief requested in order to protect the children.

On the form order, the trial court checked the boxes

for remedies prohibiting respondent from committing acts of abuse or threats of abuse against all protected persons, including (1) harassment, interference with personal liberty, physical abuse, or stalking; (2) intimidation of a dependent; (3) willful deprivation; (4) neglect; and (5) exploitation. Respondent was further ordered to (1) stay 100 feet away from petitioner and the children, (2) stay 500 feet away from the children's residence when they are present, (3) not enter or remain at the children's respective schools while they are present, and (4) not enter or remain in the residence or household while under the influence of drugs or alcohol and constituting a threat to the safety or well-being of the children.

Respondent need not have previously exhibited behavior that would fit squarely into each of the remedies granted herein before the trial court could order that he be prohibited from doing so in the future. The only remedy imposed that appears to be inappropriate is "neglect" because it is defined to apply specifically to "high-risk adult[s] with disabilities." 750 ILCS 60/103(11)(A) (West 2006). Otherwise, the trial court did not abuse its discretion in imposing the other remedies. Therefore, the trial court is directed to amend the order to delete the neglect remedy on its face. In all other respects, we find that the court did not abuse its discretion in entering the order.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's

judgment as modified and remand with directions that the order be corrected on its face.

Affirmed as modified and cause remanded with directions.

KNECHT and TURNER, JJ., concur.