NOTICE

Decision filed 05/26/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200426-U

NO. 5-20-0426

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BRIAN E. EVANS, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 19-D-250 |
| | ) | |
| THERESA M. EVANS, | ) | Honorable |
| | ) | Tameeka L. Purchase, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: In a father's appeal from an expired order of protection that limited his parenting time with his children, the public interest exception to the mootness doctrine applied to the issues the father raised on appeal; the order of protection did not improperly include any claims that were barred under the doctrines of *res judicata* or collateral estoppel; the circuit court did not error in refusing to transfer the proceeding to the judge who entered the final judgment dissolving the parties' marriage months earlier in the parties' uncontested divorce; and the circuit court's order of protection that temporarily limited the father's parenting time was proper under the standards set out in the Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2018)) and was not against the manifest weight of the evidence.

1

¶ 2    The petitioner, Brian E. Evans, and the respondent, Theresa M. Evans, amicably ended their marriage in an uncontested divorce proceeding. The parties' dissolution judgement incorporated an agreed parenting plan in which Brian and Theresa equally divided parenting time with their two minor children. Approximately four months later, Theresa filed a petition seeking protection from Brian under the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2018)), for herself and the parties' two children. The circuit court entered a plenary order of protection that limited Brian's parenting time to supervised visitation. The circuit court limited the duration of the order of protection to 90 days, during which time the parties were to return to the domestic docket for a permanent resolution of their parenting time issues. Theresa subsequently filed an emergency motion to modify the order of protection, and the circuit court modified the plenary order of protection to temporarily suspend Brian's parenting time with one of the minor children for the duration of the 90-day order of protection. Brian now appeals from the modified order of protection. For the following reasons, we affirm.

¶ 3                        I. BACKGROUND

¶ 4    Brian and Theresa were married in May 2008 and had two children during their marriage: A.E., who was born in 2015, and S.E., who was born in 2016. Brian and Theresa ended their marriage on April 8, 2019, when the circuit court granted them an uncontested divorce. Judge Stacy Campbell was assigned to preside over Brian and Theresa's divorce proceeding, and Judge Campbell entered an agreed judgment dissolving the parties' marriage. Brian and Theresa's marital dissolution included an agreement to share decision making authority regarding their minor children and an agreement that each parent shall

2

have equal periods of parenting time. The agreed dissolution judgment incorporated the terms of the parties' agreement with respect to the allocation of their parental responsibilities and incorporated the terms of an agreed parenting plan. The parties' uncontested divorce did not include any allegations of abuse by either party.

¶ 5    In July 2020, the children attended the same daycare. On July 24, 2020, daycare workers discovered purple and blue marks on S.E.'s backside. The director of the daycare center asked A.E. how S.E. might have gotten the marks, and A.E. reported that Brian had hit S.E. the prior evening for peeing on himself during Brian's parenting time. The daycare director called the Department of Children and Family Services (DCFS) who started an investigation, and a caseworker called Theresa about the marks. The DCFS caseworker also asked A.E. about the marks on S.E., and A.E. reported to the caseworker that Brian hit S.E. when S.E. peed himself. According to the caseworker, A.E. reported that Brian gave S.E. "lots of whoopings for peeing on himself."

¶ 6    On July 27, 2020, in the divorce proceeding, Theresa filed an *ex parte* petition seeking an emergency and plenary order of protection pursuant to the Domestic Violence Act. Theresa's petition alleged the incident in which the marks were discovered on S.E.'s backside on July 24, 2020. Theresa also alleged that on another occasion in March 2020, she noticed that S.E. had what appeared to be a slap mark on his back after spending time with Brian. According to the allegations in Theresa's petition, Brian claimed that he did not know what happened to cause the slap mark, but Brian's mother told Theresa that the mark was caused by S.E. falling off a stool at an ice cream shop. According to Theresa, however, the mark looked "suspicious."

3

¶ 7    In addition to these two incidents that occurred in July 2020, Theresa also alleged incidents that occurred during the marriage involving Brian's abuse directed at her. Those incidents included an incident in 2018 during which Brian allegedly slammed Theresa against a kitchen counter and an incident in 2018 during which Brian allegedly cornered Theresa and shouted at her in front of the children, making her feel unsafe. Theresa alleged that in late 2018, prior to their divorce, Brian stalked her at work and confessed to "bugging" her car and phone when they were going through the divorce. Theresa alleged that in 2016, Brian crashed his vehicle while intoxicated, ran into nearby woods, beat his head against a tree so it would look like he was mugged, hid his phone and wallet in the woods, and called the police to falsely report a mugging. Finally, Theresa alleged that in 2015, Brian went missing while intoxicated. He was found by police, returned home, and Brian's mother stayed with Brian to ensure Theresa's safety.

¶ 8    Theresa appeared *pro se* in court on July 27, 2020, for a hearing on her request for an emergency order of protection. Judge Tameeka Purchase presided over the emergency hearing. At the hearing, Theresa testified that shared parenting time with Brian had been "working fine until recent events." She then testified about her telephone call with the DCFS caseworker on July 24, 2020, regarding S.E.'s bruising, and presented the circuit court with pictures of the bruising. She also testified about the hand mark on S.E.'s back that she discovered on the prior occasion in March 2020 after S.E. had spent parenting time with Brian. Theresa presented the circuit court with a picture of this bruising as well. The circuit court described the pictures as follows: "There is a picture of [S.E.'s] back side showing significant bruising on his buttocks and back and it looks like the shape of what

4

could be a handprint. It looks like three long bruising—bruises, as well as some bruises on the lower back."

¶ 9　The circuit court asked Theresa whether she had talked to Brian about the incident, and Theresa testified that she was afraid to contact Brian until an order of protection was in place. To establish the basis of her fear, Theresa testified about the incident during the marriage when Brian allegedly slammed Theresa against the kitchen counter. The circuit court asked Theresa whether she "thought about going back to the family court to modify the parenting agreement," and Theresa responded that her intention was to do so and to modify their agreement immediately after she could talk with a lawyer.

¶ 10　At the conclusion of the hearing, the circuit court entered an emergency order of protection. The emergency order of protection named Theresa and the minor children as people protected by the order. The order gave Theresa physical care and possession of A.E. and S.E., reserved Brian's parenting time until a later hearing, and prohibited Brian from having contact with the minor children. The circuit court scheduled an August 17, 2020, hearing on Theresa's request for a plenary order of protection.

¶ 11　After Theresa hired an attorney, Theresa filed pleadings pursuant to the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/101 *et seq*. (West 2018)) seeking a permanent modification of Brian's parenting time as set out in the parties' agreed parenting plan. Specifically, Theresa filed an emergency motion requesting that the circuit court suspend Brian's parenting time or, alternatively, ordering supervised parenting time for Brian. In her petition, Theresa alleged the two 2020 bruising incidents as a substantial change in circumstances justifying the requested modification in Brian's

5

parenting time. Theresa also filed a separate petition requesting the circuit court to modify the parties' agreed parenting plan by awarding Theresa the majority of parenting time and limiting Brian's parenting time to supervised parenting time until further order of the court. The pleadings Theresa filed under the Dissolution Act are not at issue in this appeal.

¶ 12    By agreement of the parties, Judge Purchase continued the emergency order of protection to October 13, 2020, the date for the hearing on Theresa's request for a plenary order of protection. Without objection from Brian, Judge Purchase presided over the October 13, 2020, hearing on Theresa's request for protection under the Domestic Violence Act. At the October 13, 2020, hearing, Theresa testified about the telephone call she received from a DCFS caseworker on July 24, 2020, informing her of the marks found on S.E. at daycare and telling Theresa to pick up A.E. and S.E. from daycare for their safety. The court admitted the pictures of the marks on S.E.'s backside that Theresa took on July 24, 2020, after picking up the children from daycare.

¶ 13    Theresa testified that the July 24, 2020, incident was not the first time she was concerned with possible physical abuse of one of the children and told the circuit court about finding what appeared to be a slap mark on S.E.'s back in March 2020. Theresa testified about discovering the mark when S.E. was getting ready for a bath after just having returned from Brian's care. The circuit court admitted a photograph of a picture Theresa took of this mark on S.E.'s back as well as screen shots of texts Theresa exchanged with Brian about the mark. According to Theresa, Brian's mother told her that S.E. had fallen off a stool while out for ice cream, but Theresa did not believe that the marks were consistent with this type of accident.

6

¶ 14 The director of the daycare center that S.E. and A.E. attended testified about discovering the marks on S.E. on July 24, 2020. The director testified that she then talked to A.E. and learned that Brian had spanked S.E. the previous day for peeing on himself. The director then called the DCFS hotline. The director testified that the children continued under her care at the daycare center after the incident and that she had not seen any further bruising or injuries on the children.

¶ 15 Theresa acknowledged that DCFS investigated one of the teachers at the daycare center for slamming S.E. against a cot, but the investigation came back as unfounded, and the teacher later retired from the daycare center. In addition, Theresa noted that S.E. would occasionally get bitten by other children while at the daycare. Theresa also told the court that, prior to the divorce proceeding, Brian hacked one of her phones to gain information from it and that he bugged her car to record her conversations inside the car. Theresa also told the circuit court that Brian stalked her at her workplace during the divorce and recorded her when she had no knowledge that he was doing so. According to Theresa, these activities stopped in late 2018 before they decided they were getting divorced. Theresa speculated that Brian's deployment to Afghanistan with the military may be contributing to his behaviors.

¶ 16 During Theresa's direct testimony, her attorney asked her whether Brian had a history of physical violence against her. Over Brian's objection, the circuit court allowed Theresa to testify about violent incidents that occurred during the marriage that were alleged in her petition, including the incident in November 2018 when Brian allegedly "slammed" Theresa against the kitchen counter. According to Theresa, A.E. witnessed the

incident and blamed himself for not protecting his mother. Theresa also recounted a history of verbal abuse directed at her in front of the children during the marriage. Theresa testified that during some of these incidents, she would call Brian's mother or her parents to come to the house for her safety and she would lock herself and the children in a room to get away from Brian. Theresa told the court about incidents involving Brian's alcohol abuse, including the incident in 2016 when Brian allegedly wrecked his vehicle while driving intoxicated and faked being mugged as a cover for the accident.

¶ 17    Theresa testified that, in addition to the petition for an order of protection, she had also filed a motion to change the parenting plan in family court as well as a motion for the appointment of a guardian *ad litem* in the family court proceeding. Theresa asked the circuit court to enter at least an interim order of protection for 60 days to protect her and the children but allowing Brian to have supervised parenting time until such time as she can get her petition under the Dissolution Act heard in family court.

¶ 18    Brian's mother, Edith Evans, testified about the incident in which S.E. fell off a stool at an ice cream parlor in March 2020. Edith testified that she told Theresa when the accident happened and told Theresa that S.E. could have hit his back when he fell although she did not check for any injuries on his body, only his head. Theresa never told Edith that she was suspicious about what happened during this March 2020 incident.

¶ 19    Brian testified that he never abused his children and did not have a drinking problem. He stated that he was not present when A.E.'s accident happened in March 2020 and that Theresa never relayed any suspicions about the accident. He denied stalking Theresa at work and denied hacking into her phone. With respect to the vehicle accident in

March 2016, Brian testified that his car keys and wallet were taken when he was mugged, and that the assailant took his car and wrecked it. He denied shouting at Theresa or slamming her against anything during their marriage. He did admit, however, to placing a recording device in Theresa's car while they were married to record her conversations with other men. He did so because he suspected that she was cheating on him.

¶ 20    With respect to Brian's visit with the children on July 23, 2020, Brian testified that his mother picked up the children between 3:30 and 4 p.m. and that she returned the children to Theresa's house at 9 p.m. He testified that during this visit he spanked S.E. three times with his hand for throwing a toy at his brother, for peeing himself and not saying he needed to go to the bathroom, and for splashing water after being told to stop. According to Brian, his spankings did not leave any bruises. Brian testified that he spanked both children during the marriage in Theresa's presence and that Theresa herself spanked one of the children on at least one occasion. According to Brian, Theresa never told him not to spank their children. At the time of the hearing, Brian had not seen the children since his parenting time on July 23, 2020.

¶ 21    During his testimony, Brian agreed that supervised parenting time was the best option while an investigation into S.E.'s bruising was ongoing. He agreed that his mother could supervise his parenting time. Brian testified that he did not know who put the bruises on S.E. but would like to find out. He did ask the circuit court to end the order of protection and to allow Theresa's petitions under the Dissolution Act to move forward.

¶ 22    At the conclusion of the hearing, Judge Purchase entered an order granting Theresa's request for a plenary order of protection. The circuit court found Theresa's

testimony to be credible and found that her testimony established that physical abuse and harassment had occurred. The circuit court stated, "I don't believe, based on the testimony that was put forth, that there's a doubt that [S.E.] on the date in question received three, at least three spankings" and that the spankings left significant bruising on S.E. which was "too much." The circuit court noted that Brian's past harassment of Theresa included Brian placing a recording device in Theresa's vehicle and that Brian's abuse included physical abuse of S.E. The circuit court "considered the nature, severity, pattern and consequences" of Brian's past abuse and found that there was a likelihood of danger of future abuse without a plenary order of protection in place. The circuit court granted Brian parenting time during the day on weekends to be supervised by a family member but denied Brian overnight parenting time while the plenary order of protection was in place.

¶ 23    Judge Purchase ordered the plenary order to be effective for only 90 days, just long enough for the parties to have the opportunity to "get back into family court and deal with this on a long-term basis." The plenary order, therefore, expired on January 13, 2021. The circuit court stated that it hoped by the end of the order, "the judge in family court can help you to guide you towards a longer term solution to this issue."

¶ 24    Eight days after the circuit court entered the plenary order of protection, on October 29, 2020, Theresa filed an emergency motion to modify the plenary order of protection. Theresa alleged that the first weekend of Brian's parenting time following the entry of the plenary order of protection, A.E. "began exhibiting behavioral changes, including violent outbursts, self-harm and suicidal statements" that culminated in his hospitalization on October 25, 2020. According to Theresa, A.E.'s healthcare providers believed Brian's

10

parenting time should be suspended until A.E. could be further evaluated for treatment. In addition, Theresa alleged that Edith left S.E. alone with Brian in a vehicle unattended for several minutes while she was supervising Brian's parenting time.

¶ 25   On November 19, 20, and 25, 2020, Judge Purchase conducted a hearing on the emergency motion to modify the plenary order of protection. At the beginning of the hearing, Brian requested Judge Purchase to transfer the case to Judge Campbell, who, as stated above, was the judge who was assigned to handle the parties' dissolution case in family court and who entered the agreed judgment for the dissolution of the parties' marriage. Brian noted that Theresa had a motion under the Dissolution Act pending before Judge Campbell that had not been noticed for hearing. The circuit court, however, denied Brian's request, holding that the order of protection case should not be transferred but adding that Judge Campbell could modify the order of protection "as she sees fit as the case comes before her." Judge Purchase noted that the order of protection was only for 90 days and that the family court judge would have "ample time to make the final decisions on parenting time between the parties." Judge Purchase, therefore, proceeded to hear the merits of Theresa's motion to modify the plenary order of protection.

¶ 26   At the hearing, Theresa called Dr. Rahul Bansal, a child psychologist who had been treating A.E. Dr. Bansal conducted his first evaluation of A.E on October 27, 2020. Dr. Bansal opined that A.E.'s recent episodes were caused by "compulsivity and hyperactivity" and that the primary diagnosis was attention deficit hyperactivity disorder (ADHD). A.E.'s treatment plan included medications for mood stability, but at that time, the doctor did not know how A.E. would respond to the medications. According to Dr. Bansal, A.E.'s visits

11

and telephone calls with Brian have been stressful for A.E. Accordingly, Dr. Bansal recommended suspending A.E.'s visits and communication with Brian pending the doctor's comprehensive evaluation of A.E. The doctor also believed that some type of therapy for A.E. was needed.

¶ 27 Theresa testified that Brian's first parenting time with the children following the entry of the plenary order of protection occurred on October 16, 2020. In addition, the children also had some FaceTime visits with Brian after entry of the order of protection. According to Theresa, after these visits, A.E.'s "behavior drastically started to change" including aggressive behavior and "meltdowns at least every other day." Theresa testified that prior to Brian's parenting time on October 25, 2020, A.E. became very aggressive about not wanting to go and made suicidal statements. Theresa, therefore, called 9-1-1 and took A.E. to the hospital. Theresa explained that it required medications and a team of doctors and nurses to calm A.E. down. According to Theresa, the staff at the hospital recommended a hold on Brian's visits until it could be determined what was causing A.E.'s behavioral changes. Theresa told the circuit court that she was asking the court to put a hold on Brian's visits with A.E until a guardian *ad litem* could be appointed and the matter addressed in family court.

¶ 28 Brian testified that for his first visit with his children after the entry of the plenary order of protection, his mother, Edith, picked up the children from Theresa, and he spent approximately two hours with the children before he had to go to work. He told the court that the children ate and played around and that neither A.E nor S.E. appeared distressed. According to Brian, the children hugged him and had a good time during his supervised

parenting time. Brian testified that he had one FaceTime visit with the children following the entry of the plenary order, during which he interacted with A.E. and S.E. for 30 minutes. He described it as a "good interaction" and stated that neither child cried during the interaction nor seemed distressed. According to Brian, A.E. was excited to show Brian his new book bag. Brian testified that he did not know that anything was wrong with his parenting time until the next Saturday when Edith showed up to pick up the children and was told that Theresa had gone to the hospital with A.E.

¶ 29 Edith also testified that the children were excited to see Brian during Brian's first supervised parenting time following the entry of the plenary order of protection. According to Edith, the children were "not at all" in distress before the visit. Edith explained that, during the parenting time, Brian played with the children and "nothing was out of order at all." Both A.E. and S.E. played with Brian, and Edith did not witness any reaction from the children that indicated either child was afraid or apprehensive about their visit with Brian. According to Edith, when leaving, the children were excited to come back and see Brian again the following week.

¶ 30 At the conclusion of the hearing, the circuit court noted that the case started with an incident during which Brian's spanking of S.E. resulted in significant bruising. With respect to A.E., the circuit court stated that A.E. witnessed the incident in which Brian shoved Theresa against a kitchen counter, which constituted "intimidation of a dependent." The circuit court then noted that shortly before Brian resuming his parenting time, A.E. exhibited medical symptoms, including suicidal ideation and aggression, since the entry of the plenary order of protection. The circuit court, therefore, suspended Brian's parenting

13

time with A.E. for the duration of the order of protection but added that the order was "modifiable by a family court." The circuit court did not modify Brian's parenting time with S.E., finding that having the parenting time supervised ensured that there would be no physical violence toward S.E. In addition, the circuit court allowed Brian to continue with phone visits if A.E. wanted to continue to participate in those visits. The court allowed Brian to be present for A.E.'s appointments with Dr. Bansal with the hope that Dr. Bansal would assist in reintroducing Brian to A.E. In modifying Brian's parenting time, the circuit court emphasized that A.E.'s health and his well-being superseded all other considerations. Brian now appeals from the circuit court's modified plenary order of protection.

¶ 31                                      II. ANALYSIS

¶ 32    In creating the Domestic Violence Act, the Illinois legislature recognized that domestic violence is "a serious crime against the individual and society" and that "the legal system has ineffectively dealt with family violence in the past, allowing abusers to escape effective prosecution or financial liability." 750 ILCS 60/102(1), (3) (West 2018).

¶ 33    The Domestic Violence Act provides for three types of orders of protection: emergency (*id.* § 217), interim (*id.* § 218), and plenary (*id.* § 219). The present case concerns a plenary order of protection. Section 219 of the Domestic Violence Act provides that a plenary order of protection "*shall issue*" if the petitioner has, among other things, satisfied the requirements of section 214 of the Domestic Violence Act. (Emphasis added.) *Id.* § 219. Section 214 of the Domestic Violence Act, in turn, provides that "[i]f the court finds that petitioner has been abused by a family or household member *** an order of protection prohibiting the abuse *** *shall* issue." (Emphasis added.) *Id.* § 214. The

14

Domestic Violence Act defines "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in *loco parentis*." *Id.* § 103(1).

¶ 34    On appeal, Brian argues that, in entering a plenary order of protection under the Domestic Violence Act, the circuit court improperly considered testimony of incidents that occurred prior to the judgment for the dissolution of the marriage, which was entered on April 8, 2019. Brian argues that evidence of those past incidents (incidents occurring prior to April 8, 2019) should have been barred by *res judicata* or collateral estoppel. Brian also argues that Judge Purchase erred in denying his request to transfer the case under the Domestic Violence Act to Judge Campbell, who was assigned to handle the divorce case on the domestic relations docket. In addition, Brian argues that the circuit court applied the incorrect standard for restricting his parenting time.

¶ 35                              A. Mootness

¶ 36    The first issue we must address is the mootness of Brian's appeal. The plenary order of protection from which Brian appeals expired on January 13, 2021, before the merits of Brian's appeal could be heard before this court. Therefore, we must first determine whether we should decline to review the issues presented on appeal pursuant to the mootness doctrine.

¶ 37    "An issue raised on appeal becomes moot when the issue no longer exists due to events occurring after the filing of appeal that make it impossible for the appellate court to grant effective relief." *Benjamin v. McKinnon*, 379 Ill. App. 3d 1013, 1020 (2008). However, "[a] case that is considered moot may still be subject to review if it involves a

15

question of great public interest." *Whitten v. Whitten*, 292 Ill. App. 3d 780, 784 (1997). Illinois courts have held that, even after the expiration of an order of protection renders issues raised on appeal "formally moot," the issues nonetheless can be reviewable "under the public-interest exception to the mootness doctrine." *Benjamin*, 379 Ill. App. 3d at 1020; see also *Whitten*, 292 Ill. App. 3d at 784 (holding that the Domestic Violence Act addresses "a grave societal problem" and involves matters of public interest). The factors relevant to the public interest exception are: (1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will generally recur. *In re A Minor*, 127 Ill. 2d 247, 257 (1989).

¶ 38     Brian argues that his appeal should not be dismissed as moot because it involves a matter of public concern. Brian notes that this case involves the ability of the circuit court to enter orders concerning the allocation of parenting time in proceedings under the Domestic Violence Act when there is also a petition under the Dissolution Act pending on the domestic relations docket. Theresa takes no position with respect to whether Brian's appeal of the plenary order of protection is moot. We agree that the Domestic Violence Act addresses issues of great public interest and that its purposes can only be accomplished if the courts properly apply the statutory requirements. See *Whitten*, 292 Ill. App. 3d at 784. Therefore, we agree with Brian that the public interest exception to the mootness doctrine applies in this case, and we will address the merits of his appeal.

¶ 39                      B. *Res Judicata* and Collateral Estoppel

¶ 40     Next, Brian argues that the circuit court improperly considered evidence of incidents that occurred prior to the parties' uncontested divorce which was finalized on April 8, 2019.

16

Brian argues that allegations of incidents that occurred prior to the uncontested divorce were barred by *res judicata* and collateral estoppel.

¶ 41    The *res judicata* doctrine reflects a public policy favoring finality in litigation and judicial economy. *Pfeiffer v. William Wrigley Jr. Co.*, 139 Ill. App. 3d 320 (1985). "*Res judicata* is separated into two distinct doctrines: (1) true *res judicata*, which is known as 'claim preclusion,' and (2) collateral estoppel, which is known as 'issue preclusion.' " *Hayes v. State Teacher Certification Board*, 359 Ill. App. 3d 1153, 1161 (2005). Although *res judicata* and collateral estoppel are different, they serve same purpose, *i.e.*, "promoting judicial economy and preventing repetitive litigation." *Id*.

¶ 42                              1. *Res Judicata* (Claim Preclusion)

¶ 43    There are three requirements for *res judicata* to apply: (1) there must be a final judgment on the merits rendered by a court of competent jurisdiction, (2) there must be an identity of cause of action, and (3) there must be an identity of parties or their privies. *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 334 (1996). "The doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Id*. Furthermore, *res judicata* serves to bar " 'all matters that were offered to sustain or defeat the claim in the first action, as well as all matters that could have been offered for that purpose.' " *Hayes*, 359 Ill. App. 3d at 1161. Finally, we note that the party that seeks to invoke the doctrine of *res judicata* bears the burden of proof. *Cload v. West*, 328 Ill. App. 3d 946, 950 (2002). In the present case, that party is Brian.

17

¶ 44   There is no dispute that Brian established element number three because Brian and Theresa were the same parties in both the marital dissolution case filed under the Dissolution Act and in the proceedings at issue in this appeal under the Domestic Violence Act. In addition, with respect to the first element, the dissolution case resulted in a final judgment on the merits rendered by a court of competent jurisdiction as it relates to Brian's parenting time. However, Brian has failed to establish the second element of *res judicata*, *i.e.*, identity of cause of action.

¶ 45   In determining whether there is an identity between the causes of action, it is well established that "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." (Internal quotation marks omitted.) *Doe v. Gleicher*, 393 Ill. App. 3d 31, 37 (2009).

¶ 46   Here, the uncontested divorce under the Dissolution Act and Theresa's request for an order of protection under the Domestic Violence Act do not arise from a single group of operative facts. As Theresa points out in her arguments before this court, the divorce proceedings were uncontested, and the circuit court entered an agreed order approving the parties' agreement with respect to a parenting plan that included equal parenting time for both parents. The parties submitted their agreed parenting plan within four days of Brian filing the petition for dissolution of the marriage, and there was no litigation of any issues relating to the best interests of the parties' minor children. The parties deemed the parenting plan to be in the best interests of their children, and the circuit court approved the parenting plan based on the parents' agreement concerning the best interests of their children. None

18

of the terms of the uncontested divorce concerned whether either party (Theresa or Brian) was abused by the other during the marriage.

¶ 47 Under the Domestic Violence Act, "abuse" is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2018). "Physical abuse" includes "knowing or reckless use of physical force." *Id.* § 103(14). The facts surrounding the incident resulting in S.E.'s bruising after being spanked by Brian arose *after* the uncontested divorce was finalized. Accordingly, it was impossible for Theresa to raise any issues stemming from this abuse during the divorce proceeding even if there had been litigation in the divorce proceeding over abuse. Therefore, the circuit court's protection of S.E. does not encompass any *res judicata* concerns whatsoever.

¶ 48 In addition, with respect to A.E., one of the purposes of the Domestic Violence Act is to protect children from exposure to conflict and violence. *Mowen v. Holland*, 336 Ill. App. 3d 368, 375 (2003). The circuit court concluded that A.E. needed protection under the Domestic Violence Act after the court found that A.E. had been subject to "intimidation of a dependent." Subjecting a child to "the witnessing of[ ] physical force against another" constitutes intimidation of a dependent (750 ILCS 60/103(10) (West 2018)) and therefore falls within the definition of "abuse" under the Act (*id.* § 103(1)). In addition, as noted above, under the Domestic Violence Act, "[i]f the court finds that petitioner has been abused by a family or household member *** an order of protection prohibiting the abuse *** *shall* issue." (Emphasis added.) *Id.* § 214.

19

¶ 49 Here, Theresa presented evidence that, during the marriage, A.E. witnessed Brian shoving Theresa against a counter. In addition, Theresa presented evidence that after the circuit court entered the judgment dissolving the marriage, A.E. witnessed Brian's abuse of S.E. when S.E. was spanked multiple times to the point of bruising during Brian's parenting time of both children. A.E. explained what happened to S.E. to Theresa, the director of the daycare center, and the DCFS caseworker. This incident involving additional exposure of A.E. to conflict and violence occurred after the divorce proceeding and constitutes an additional incident of intimidation of a dependent that could not have been raised in the divorce proceeding. The evidence suggests that the spanking incident witnessed by A.E. amplified A.E.'s fears and emotional trauma and resulted in A.E. needing hospitalization and treatment by a child psychologist. Therefore, the protection of A.E. in the plenary order of protection does not violate the *res judicata* doctrine as the two proceedings are not and could not be based on the same operative facts as they relate to A.E. The *res judicata* doctrine simply does not prohibit the circuit court from protecting A.E. from intimidation of a dependent under the Act merely because some facts that establish the need for the protection occurred prior to his parents' uncontested divorce.

¶ 50 The circuit court was obviously concerned with protecting A.E. and S.E. from abuse. Given the summary nature of the parents' uncontested divorce, we believe the circuit court properly exercised caution in refusing to apply *res judicata* in a way that would preclude the circuit court from protecting the children from abuse based on facts that had never been presented to the court by the parties and could not have been presented at the time of the divorce. Much of the facts surrounding the children's abuse occurred after the

divorce case and after the parents had agreed upon a parenting plan. Therefore, the circuit court ruled correctly in rejecting Brian's request to apply the *res judicata* doctrine to deny protection of the children under the Domestic Violence Act.

¶ 51 Finally, with respect to evidence of Brian's abuse of Theresa during the marriage, the abusive nature of the relationship between Brian and Theresa was not at issue during the uncontested divorce proceeding. Accordingly, the operative facts of the uncontested divorce under the Dissolution Act and the operative facts of the proceedings under the Domestic Violence Act are not the same as they relate to Brian's abuse of Theresa. Brian's abuse of Theresa was not a matter that was or could have been offered to sustain or defeat any of Theresa or Brian's claims for support or marital property in the uncontested divorce action. Theresa and Brian's divorce judgment, marital settlement agreement, and parenting plan focused only on what they believed to be the best interests of their children at the time; they did not raise or address any abuse that occurred strictly between themselves during the marriage. Therefore, the purpose of Theresa's petition under the Domestic Violence Act was not to seek another opportunity to litigate the same claims against Brian, but instead her purpose was to ensure the safety of herself and her children in light of the events that arose after the dissolution of the marriage. Accordingly, under the facts of this case, *res judicata* does not operate to prohibit the circuit court from entering a plenary order of protection naming Theresa as a protected person in the order.

¶ 52 Furthermore, as Theresa notes in her brief, section 214 of the Domestic Violence Act requires the circuit court to consider the frequency and pattern of abuse in determining whether to grant an order of protection. 750 ILCS 60/214(c)(1)(i) (West 2018). Here, in

granting the plenary order of protection, the circuit court expressly followed this statutory requirement, stating that it considered the nature, severity, pattern, and consequences of the recent abuse and the past abuse in determining the likelihood of danger of future abuse. Based on this relevant evidence, the circuit court found that "the action of [Brian], unless prohibited, will likely cause irreparable harm or continued abuse," making a plenary order of protection necessary. The circuit court, therefore, ruled correctly in admitting evidence of abuse that occurred during the marriage and in considering that evidence in determining whether to enter a plenary order of protection that included Theresa as a protected person.

¶ 53                    2. Collateral Estoppel (Issue Preclusion)

¶ 54    Collateral estoppel "promotes fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions." *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). Collateral estoppel applies when a party participated in two separate and consecutive cases arising out of the same cause of action and some controlling factor or question material to the determination of both cases has been adjudicated by a court of competent jurisdiction against the party in the former suit. *Stathis v. First Arlington National Bank*, 226 Ill. App. 3d 47, 53 (1992). The following elements are required to establish collateral estoppel:

> "(1) the issue decided in the prior litigation is identical to the one presented in the current case, (2) there was a final adjudication on the merits in the prior case, and (3) the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior litigation." *Pine Top Receivables of Illinois, LLC v. Transfercom, Ltd.*, 2017 IL App (1st) 161781, ¶ 8.

22

Defensive use of collateral estoppel involves a defendant who seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost. *In re Owens*, 125 Ill. 2d 390, 397 (1988); *Sampson v. Cape Industries Ltd.*, 229 Ill. App. 3d 943, 949 (1992).

¶ 55    Brian's collateral estoppel argument fails because there was no adjudication of any abuse claims in the uncontested divorce proceeding. "For collateral estoppel to apply, a decision on the issue must have been necessary for the judgment in the first litigation, and the person to be bound must have actually litigated the issue in the first suit." *Talarico v. Dunlap*, 177 Ill. 2d 185, 191 (1997); see also *In re Marriage of Connors*, 303 Ill. App. 3d 219, 227 (1999).

¶ 56    In addition, even where the threshold elements of the collateral estoppel doctrine are satisfied and an identical common issue is found to exist between a former and current lawsuit, collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped. *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 467-68 (1996); see also *Van Milligan v. Board of Fire & Police Commissioners*, 158 Ill. 2d 85, 96 (1994); *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 25.

¶ 57    Here, fairness requires Theresa to have the opportunity to seek an order of protection under the Domestic Violence Act following the events that have occurred since the parties' uncontested divorce. Collateral estoppel simply does not apply in this case to prevent the circuit court from entering an order under the Domestic Violence Act to protect Theresa and the children from Brian's abuse.

¶ 58          C. Denial of Brian's Request to Transfer the Matter From the
              Domestic Violence Docket to the Domestic Relations Docket

¶ 59    Next, Brian argues that the circuit court erred in denying his request to transfer the proceedings under the Domestic Violence Act to the judge who presided over their uncontested divorce. We disagree.

¶ 60    Illinois Supreme Court Rule 903 (eff. Mar. 8, 2016) provides that "[w]henever *possible and appropriate*, all child custody and allocation of parental responsibilities proceedings relating to an individual child shall be conducted by a single judge." (Emphasis added.) In creating this one-judge rule, our supreme court has expressed a preference for the same judge to hear all proceedings involving child custody and the division of parental responsibilities. *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 66. Likewise, section 212 of the Domestic Violence Act provides that a "petition for an order of protection shall be treated as an expedited proceeding, and no court shall transfer or otherwise decline to decide all or part of such petition except as otherwise provided herein." 750 ILCS 60/212(a) (West 2018). Section 212 of the Domestic Violence Act further provides for discretionary transfer as follows:

    "Any court or a division thereof which ordinarily does not decide matters of child custody and family support *may* decline to decide contested issues of physical care, custody, visitation, or family support unless a decision on one or more of those contested issues is necessary to avoid the risk of abuse, neglect, removal from the state or concealment within the state of the child or of separation of the child from the primary caretaker. If the court or division thereof has declined to decide any or

24

all of these issues, then it shall transfer all undecided issues to the appropriate court or division." (Emphasis added.) *Id.* § 212(b).

¶ 61 Brian also directs our attention to the local rules of the Circuit Court of the Twentieth Judicial Circuit. Local rule 8.05(A) provides: "Petitions for emergency orders of protection shall generally be heard by the judge assigned to the Domestic Violence Courtroom. Petitions for emergency orders of protection shall be heard promptly and need not be scheduled in advance." 20th Judicial Cir. Ct. R. 8.05(A) (Oct. 2017). Also, subsection (B) of local rule 8.05 states: "It is the goal of this circuit to have all proceedings related to a child(ren) conducted by a single judge where possible." 20th Judicial Cir. Ct. R. 8.05(B) (Oct. 2017).

¶ 62 In the present case, when Brian filed the petition for the dissolution of the parties' marriage, the presiding judge of family division assigned the dissolution case to Judge Stacy Campbell. Four days later, Judge Campbell entered an agreed judgment of dissolution of the marriage that incorporated Theresa and Brian's marital settlement agreement. Judge Campbell also entered an agreed order allocating parental responsibilities and incorporating the parties' agreed parenting plan. There was no contested litigation concerning the minor children before Judge Campbell.

¶ 63 Theresa filed her petition under the Domestic Violence Act approximately four months after Judge Campbell granted the uncontested divorce. Theresa filed her petition in the underlying divorce case. In her petition, Theresa requested an emergency order to protect herself and the minor children. On the same day she filed her petition, Theresa appeared *pro se* before Judge Tameeka Purchase and testified about the allegations of

25

abuse alleged in her petition. Judge Purchase granted Theresa's request for an emergency order of protection. Theresa then filed a petition in the divorce proceeding to permanently modify Brian's parenting time pursuant to the Dissolution Act. At the time Judge Purchase entered the emergency order of protection, there was nothing pending before Judge Campbell under the Dissolution Act.

¶ 64    After Brian was served with a copy of Theresa's petition and the emergency order of protection, his attorney entered an appearance but did not immediately request a transfer of Theresa's petition to Judge Campbell. Instead, Brian agreed to two continuances that extended Judge Purchase's emergency order of protection to October 13, 2020, the date in which the parties agreed to hear Theresa's request for a plenary order of protection before Judge Purchase.

¶ 65    At the October 13, 2020, hearing, without objection from Brian, Judge Purchase heard testimony from Theresa, Brian, Brian's mother, and the director of the children's daycare relevant to Theresa's allegations of abuse as alleged in her petition. Based on this evidence, Judge Purchase granted Theresa's request for a plenary order of protection naming Theresa, A.E., and S.E. as persons protected by the order. Judge Purchase recognized the supreme court's preference for the same judge to hear all proceedings involving child custody and the division of parental responsibilities. Judge Purchase, therefore, limited the duration of the plenary order of protection to only 90 days, which Judge Purchase stated would provide protection to Theresa, A.E., and S.E, until the parties had "the opportunity to get back into family court to deal with this on a long-term basis."

26

¶ 66    Accordingly, in the present case, no party made any request to transfer the domestic violence proceeding until after the parties appeared before Judge Purchase and litigated Theresa's claim to a final judgment, without objection to Judge Purchase presiding over the proceeding. Brian did not make a transfer request until he again appeared in front of Judge Purchase on November 19, 2020, for a hearing on Theresa's emergency motion to modify the plenary order of protection.

¶ 67    Accordingly, it was only after Judge Purchase heard lengthy testimony and ruled against Brian on the merits of Theresa's petition that Brian then requested the matter to be transferred to Judge Campbell. Under these facts, Judge Purchase was well within her discretion to deny the late transfer request. At the time Brian made the transfer request, Judge Purchase was the only judge that had conducted any evidentiary hearings on any issues concerning the best interests of the minor children. The purpose of the one-judge rule is to protect children "who might bounce from household to household based on inconsistent, but legally correct, rulings founded on separate legislative enactments construed by different judges presiding in separate courtrooms." *In re G.P.*, 385 Ill. App. 3d 490, 502 (2008). That danger is not present when Judge Campbell had not litigated any issues prior to Judge Purchase presiding over the proceedings under the Domestic Violence Act. In addition, Theresa's attorney represented to Judge Purchase that Judge Campbell was not available to hear the matter sooner than Judge Purchase's availability.

¶ 68    Under the circumstances of this case, Judge Purchase was the proper judge to hear Theresa's request for relief under the Domestic Violence Act, including the emergency motion to modify the plenary order of protection. Judge Purchase was faced with

27

allegations of potential abuse of minor children that required immediate protection, and Judge Purchase acted properly to protect the children. The Domestic Violence Act, the supreme court rules, and the local rules cited by Brian give the circuit court discretion in deciding when a transfer is appropriate. In cases involving minor children, the safety and welfare of the minor children are paramount in making this decision. Theresa's allegations of abuse presented the circuit court with a matter of urgency that involved the safety and welfare of minor children. Under these facts, Judge Purchase simply did not abuse her discretion in protecting the children by entering the original plenary order of protection and in modifying the plenary order of protection after denying Brian's untimely transfer request.

¶ 69    Furthermore, in granting the order of protection, Judge Purchase made it very clear that while she was ruling on temporary changes to Brian's parenting time in the plenary order of protection, the order was for limited duration (90 days) and subject to modification by Judge Campbell in the family division when the parties had the opportunity to appear before Judge Campbell. Judge Purchase's ruling, therefore, complies with the letter and spirit of the one-judge rule set out by the supreme court in Rule 903. After modifying the plenary order of protection, Judge Purchase instructed the parties that any further filings would be heard by Judge Campbell, who would make any permanent modifications to parenting time that are in the children's best interests. Accordingly, we conclude that Judge Purchase committed no error in presiding over the proceedings under the Domestic Violence Act under the circumstances presented here.

¶ 70            D. Whether the Circuit Court Applied the Correct Standard
                 in Temporarily Restricting Brian's Parenting Time

¶ 71    Finally, Brian argues that the circuit court applied the incorrect standard in restricting his parenting time. Again, we disagree.

¶ 72    The Domestic Violence Act instructs the circuit court, as the trier of fact, to determine whether the persons seeking to be protected under the statute have been abused. 750 ILCS 60/205(a) (West 2018). The petitioner must prove her allegations by a preponderance of the evidence. *Id.* When the circuit court makes a factual finding, we defer to the circuit court's finding unless the finding is against the manifest weight of the evidence. *Best v. Best*, 358 Ill. App. 3d 1046, 1053 (2005). A factual finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the finding is unreasonable, arbitrary, or without basis in the evidence presented. *Id.* at 1054. We will not substitute our judgment for the trial court's regarding the credibility of witnesses, the weight it should have given to the evidence, or the inferences it should have drawn. *Id.* at 1055.

¶ 73    As stated above, the Domestic Violence Act requires the circuit court to issue an order of protection if the court finds that a petitioner has been abused by a family or household member. 750 ILCS 60/214(a) (West 2018). The available remedies under the Domestic Violence Act include allocation of the physical care and possession of minor children needing protection and temporary allocation of parental responsibilities and parenting time. *Id.* § 214(b). If the circuit court finds that the respondent has committed

abuse of a minor child, there is a rebuttable presumption that awarding the physical care of the minor to the respondent would not be in the child's best interest. *Id.* § 214(b)(5).

¶ 74    Section 214(b)(5) of the Domestic Violence Act provides:

"In order to protect the minor child from abuse, neglect, or unwarranted separation from the person who has been the minor child's primary caretaker, or to otherwise protect the well-being of the minor child, the court may do either or both of the following: (i) grant petitioner physical care or possession of the minor child, or both, or (ii) order respondent to return a minor child to, or not remove a minor child from, the physical care of a parent or person in *loco parentis*." *Id.*

¶ 75    Section 214(b)(7) of the Domestic Violence Act requires the circuit court to "restrict or deny respondent's parenting time with a minor child if the court finds that respondent has done or is likely to do any of the following: (i) abuse or endanger the minor child during parenting time; (ii) use the parenting time as an opportunity to abuse or harass petitioner or petitioner's family or household members; (iii) improperly conceal or detain the minor child; or (iv) otherwise act in a manner that is not in the best interests of the minor child." *Id.* § 214(b)(7).

Furthermore, section 214(b)(7) of the Domestic Violence Act provides that, in determining remedies under the statute, the "court shall not be limited by the standards set forth in Section 603.10 of the Illinois Marriage and Dissolution of Marriage Act." *Id.*; see 750 ILCS 5/603.10 (West 2018) (providing for restricting and modifying parental responsibilities under the Dissolution Act).

¶ 76    Here, the circuit court specifically found that abuse of A.E. and S.E. occurred and was likely to continue without an order of protection in place. Accordingly, when the circuit court entered the original plenary order of protection, the court properly restricted Brian's parenting time to only supervised parenting time on a temporary basis in order to protect A.E. and S.E. from further abuse. This remedy was proper under the terms of the Domestic Violence Act set out above.

¶ 77    At the hearing on Theresa's emergency motion to modify the plenary order of protection, the circuit court considered additional evidence of emotional trauma experienced by A.E., and the circuit court then properly denied Brian parenting time with A.E., again on a temporary basis, to allow A.E.'s care providers to assess A.E.'s issues and until such time as Judge Campbell could hear and determine Theresa's motion to modify Brian's parenting time on a permanent basis under the provisions of the Dissolution Act. Again, the paramount focus in temporarily modifying Brian's parenting time as set out in the original plenary order of protection and in the modified plenary order of protection was protecting A.E.'s and S.E.'s best interests. The language of the Domestic Violence Act authorizes the remedies handed down by the circuit court in the orders of protection, and the trial court's findings support the remedies it awarded in entering these orders. We cannot find that the circuit court's findings were against the manifest weight of the evidence, and we, therefore, cannot reverse the orders based on those findings.

¶ 78    The circuit court found Theresa to be credible, and the circuit court considered additional testimony from the director of the children's daycare center as well as the psychologist who was treating A.E. following A.E.'s breakdown stemming from Brian's

31

scheduled parenting time. The court considered the nature, severity, pattern, and consequence of Brian's actions and found a likelihood of further abuse without invoking the protections afforded by the provisions of the Act. After conducting three separate evidentiary hearings under the Domestic Violence Act, the circuit court was in the superior position to evaluate the credibility, temperaments, personalities, and capabilities of both Theresa and Brian. See *In re Marriage of Balzell*¸ 207 Ill. App. 3d 310, 314 (1991).

¶ 79    Theresa and the director of the daycare center both testified about the severity of the bruising on S.E.'s backside, and Brian admitted to spanking S.E. three times the day before the bruising was discovered. Although Brian denied causing the bruising, the circuit court considered the testimony of the witnesses as well as pictures showing the extent of the bruising. Nothing in the record allows us to conclude that the circuit court's findings were against the manifest weight of the evidence, and we must, therefore, affirm the circuit court's modified order of protection.

¶ 80                                  III. CONCLUSION

¶ 81    For the foregoing reasons, we affirm the judgment of the circuit court.


¶ 82    Affirmed.