NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220904-U

NO. 4-22-0904

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 14, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MARK SHERWIN, | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Knox County |
| BRANDIE ROBERTS, | ) | No. 22OP213 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Andrew J. Doyle, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court reversed the trial court's judgment granting an order of protection and vacated the order because petitioner did not establish abuse by a preponderance of the evidence.

¶ 2 In July 2022, petitioner, Mark Sherwin, filed a verified petition for an order of protection seeking to prohibit respondent, Brandie Roberts, from having contact with their six-year-old child, L.S. Following a September 2022 hearing, the trial court granted Sherwin's petition.

¶ 3 Roberts appeals, arguing that the trial court erred by issuing the order of protection because the record contained no evidence of abuse or harassment. Roberts, representing herself in this appeal, asserts several other arguments that we need not reach because we agree that the court's order was not supported by the evidence. Accordingly, we reverse the judgment of the trial court and vacate the order of protection.

¶ 4                                    I. BACKGROUND

¶ 5                        A. The Petition for a Plenary Order of Protection

¶ 6           In July 2022, Sherwin filed a petition for an order of protection, asking the trial court to prevent Roberts from having any contact with their six-year-old child, L.S. In the petition, Sherwin alleged that he was the primary responsible party for L.S. and that there was another pending court case in Knox County involving the "[allocation] of parental responsibilities" between Sherwin and Roberts.

¶ 7           In the body of the petition, Sherwin alleged that an order of protection was necessary because on July 21, 2022, "Leola Schlaf called Cara Boynton to let her know [Roberts's] bus was parked in front of Brad Galloway[']s house ***. [(We note that Roberts owned a school bus that she used as a personal vehicle, and Galloway was her boyfriend.)] Cara called Barb Sherwin [(petitioner's mother)] who called the police for a well[-]being check on [L.S.] at that location." However, before the police arrived, the bus departed.

¶ 8           Sherwin also alleged that, earlier that same day, Roberts informed him she was keeping L.S. "[until] August 7th for a vacation request [Sherwin] had denied multiple times." Sherwin called the police for a "police standby to pick up [L.S.]" and went to Roberts's house. When he arrived, he "saw the front door wide open to the house, empty beer cans [and] trash all around the yard." He found Roberts and L.S. in the bus parked in the backyard. He wrote, "Trash and an illegal fire pit were the first noticeable things." Sherwin further alleged that the responding police officer told him that (1) "L.S. was present at another call where Brad Galloway was present" and (2) Roberts told the officer that Roberts "believed [Galloway] would kill her and [L.S.]"

¶ 9           Sherwin also alleged the following additional incidents, taken from police reports that he attached as exhibits to his petition:

(1) In July 2022, a "third party" called the police to report that Galloway was present at Roberts's residence in violation of an order of protection. Galloway ran from the police. Roberts was initially uncooperative with the police but later admitted she was aware of the order of protection and that she was the protected party. She told the police that Galloway had problems with drugs and his mental health. The police report did not mention L.S. However, Sherwin alleged that his mother, Barb, was the caller and she called to request a "well[-]being" check on L.S.

(2) In April 2022, Roberts called the police to report that Galloway was present in violation of an order of protection. The police found Galloway hiding under a blanket and told police that Roberts let him come over every day. Roberts told the police that Galloway "has mental problems and he does drugs," and she was scared of him. Neither the police report nor Sherwin's written allegations mentioned L.S.

(3) In July 2020, the police responded to a 911 hangup call from Roberts's residence. Officers arrived and saw "[marks] and signs of a struggle on [Roberts's] face, chest, shoulders, and back." Roberts refused to answer questions and said only that she " 'just want[ed] to get [her child] home safe.' " The police report made no further mention of L.S., but Sherwin alleged in the petition that L.S. was present.

(4) In March 2020, the police were dispatched to the hospital because Roberts had been stabbed in the inner thigh. Roberts would not name the perpetrator but said the injury was caused by the person who had harmed her in the past. L.S. was not mentioned.

(5) In December 2019, Roberts called the police to report that Galloway had choked, punched, and kicked her and had threatened to kill her and L.S. When Galloway fell asleep, she dropped L.S. off at a grandparent's house and then went to the hospital for treatment. (We note that the police report redacted the name of the child who was present, but Sherwin alleged in the petition that the child was L.S.)

¶ 10 Sherwin also attached to his petition text messages from November 2021 between Roberts's mother and Sherwin's mother expressing concern for L.S. Specifically, Sherwin alleged that Roberts's mother told Sherwin's mother that "someone told [Roberts's mother's] son that [L.S.] had taken drugs accidentally." Sherwin also attached text messages he received in August 2021 from Roberts's adult daughter expressing concern for L.S.'s well-being when with Roberts.

¶ 11 Roberts was served with a summons ordering her to appear for a hearing on the petition in August 2022. Roberts moved to continue the hearing for the purpose of obtaining counsel, and the trial court granted her request.

¶ 12 B. The Hearing on the Petition

¶ 13 In September 2022, the matter proceeded to a hearing on the petition. Sherwin was represented by counsel, and Roberts represented herself.

¶ 14 At the beginning of the hearing, Sherwin's attorney told the trial court that, the week prior, he had filed "in the family case a motion to restrict parental responsibilities, which sort of goes hand in hand with the request in the [order of protection]." Counsel told the court that the motion had not yet been set for hearing and inquired whether the court wished to continue the order of protection hearing to consolidate it with the motion filed in the family case. The court responded that it had not yet set the motion to restrict parental responsibilities and it would do so

- 4 -

"today while [Roberts] is here," but opted to "proceed on the order of protection in the meantime."

¶ 15        The trial court asked whether the issues in the motion to restrict overlapped with issues in the order of protection. Sherwin's counsel responded that "[t]here would be some overlap" and referred to an ongoing Illinois Department of Children and Family Services (DCFS) investigation. The court stated that it believed the cases should be consolidated, but it would leave it up to Sherwin's counsel whether to proceed that day or not. Counsel replied that he and Sherwin wished to proceed that day.

¶ 16                              1. *Sherwin's Testimony*

¶ 17        Sherwin testified that he and Roberts are the parents of L.S. and they had a pending family case, Knox County No. 21-F-90. The following colloquy occurred between Sherwin and his attorney regarding the allegations in the petition:

"Q. Okay. You have made a number of allegations in the—in the petition for order of protection; is that right?

A. Correct.

Q. And these are based upon personal knowledge and confirmation that you were able to obtain prior to coming in here and signing those allegations in the petition?

A. Correct.

Q. You have become aware of additional circumstances that even took place since the July petition; is that right?

A. Yes.

Q. And that prompted the filing of the motion to restrict [parental responsibilities]?

A. Correct.

Q. Recently in August when [L.S.] was with [Roberts], was [Roberts's] vehicle stopped?

A. Yes

Q. And there was some issue with regard to [Roberts's] vehicle being stopped. The vehicle had unusual plates, the trailer that was being hauled had stolen plates, and there was a charge against [Roberts] for possession of meth, correct?

A. Correct.

Q. And your son was in the vehicle at that time?

A. Correct.

Q. Has DCFS investigated into that incident?

A. Yes.

Q. And have they made an indication one way or the other?

A. Yeah. They told me it was basically ruled as indicated, which means there's enough evidence to consider it true.

Q. And that was for endangerment of a child?

* * *

A. Correct.

Q. And is that investigation ongoing?

A. When it's considered indicated, I think that's a ruling, but I'm not sure. As far as I know, it's—she's supposed to be getting me a—a copy of the report.

* * *

Q. Okay. The—the allegations without going into detail identifies four

- 6 -

specific incidents which—and these are included in your handwriting on the petition, correct?

A. Correct.

Q. And these are true to the best of your ability and knowledge?

A. Correct.

Q. Have you received any information from [Roberts] denying any of these allegations?

A. No.

Q. You're not asking for the order of protection to cover yourself. You're asking for the order of protection to cover your [child, L.S.], correct?

A. Correct.

Q. And until this can get ironed out and possibly through the motion to restrict, you're asking that there be an order of protection in place where [L.S.] is in your possession?

A. Correct.

Q. Do you feel that if he remains in [Roberts's] custody, that his safety could be jeopardized?

A. Yes, absolutely.

* * *

Q. When [Roberts] was stopped recently in August and the search found meth, the issue with the license plate, were you called to come and retrieve your son?

A. No. No. I—luckily, a bad force of habit, unfortunately, my mom had

seen basically that there had been an arrest and did digging and found out what happened. I wasn't contacted by the police. I was the one that actually had to contact DCFS. They failed to even do that. So…

Q. Okay. So you had to track down your son?

A. Yeah. Yep.

Q. [Roberts] didn't call you and say—

A. No.

Q. —hey, come pick up your son from the scene?

A. No.

Q. Thank you. Nothing further."

¶ 18    During Roberts's cross-examination of Sherwin, the following colloquy occurred:

"ROBERTS: When has [L.S.] ever been harmed in my care in the last six years and five of them being where I've had sole custody?

[SHERWIN'S ATTORNEY]: I'm going to object as to the relevance of that. I mean, the allegations are the allegations. It doesn't have to identify anything within the last six years.

THE COURT: Yeah. I'll sustain the objection. You're going to have to ask a different question.

ROBERTS: Okay. No further."

¶ 19                    2. *Roberts's Testimony*

¶ 20    Roberts testified, presenting her testimony in narrative fashion due to her self-representation. Roberts stated, in relevant part, the following:

"If [this hearing is] all based on [the allegations in] that initial order of

- 8 -

protection request, then I can address those. If it's based on the allegations of drugs found in my bus, I can address those. But I'm not sure what the—what the cause is with the—the cause of me to have an order of protection with my son."

¶ 21 The trial court stopped Roberts from speaking and the following exchange occurred:

"THE COURT: Just to answer those questions, so there was a petition filed, okay, which you've seen the petition.

ROBERTS: Yes.

THE COURT: But also there was obviously additional allegations that were raised today. So, those can be—the Court can take those into consideration as well.

And then, furthermore, before you get into saying too much, I need to make you aware for the record that if you say anything involving any criminal charges or anything that could ultimately lead to a DCFS investigation—but more—more so the criminal charges—that anything that you say here is being made of record. It's all getting recorded right here. So, it could be used against you in a criminal trial—

ROBERTS: Okay.

THE COURT: —okay? So, I just want to caution you before you get too deep in there that you're potentially making yourself culpable for something that—

ROBERTS: Okay.

THE COURT: —you've been charged with.

ROBERTS: I've been told that case will be dismissed, but (unintelligible)."

¶ 22 Roberts then testified as follows:

"There are several allegations of me being around [Galloway], and

unfortunately there have been several times that I have been. [L.S.] has not. [Galloway] will show up at my place or find me wherever I am at, it seems, and cause some problems. So I typically call the police. I typically don't want him to be arrested because he needs mental help, but I called them to arrest him. I wish that wasn't the only option because I don't feel that it's going to get any better, and it's been a really strange—strange trip.

I haven't put myself or my son in danger voluntarily with [Galloway]. I've done everything I can to stay away, including last year I moved out of town. I got a school bus, and my son and I left town in last September, and we came back here to fight the custody battle. And when we did return, these same problems started happening again, and I knew that they would and they probably always will. But the—I guess I don't understand the other allegations against me of what I've done to harm my son or to show that I would harm my son.

I'm a good mom. I love my kid more than anything. The day that I got arrested, we were homeschooling on farms. We went in grain silos and learned about augers. Then we went to the river. We were on our way to the fair, and the reason that I didn't call [Sherwin] to pick up [L.S.] was because my friend that we were going to the fair with was a block away. He was right there. And as soon as I called him and told him I had problems, he was already there. So he took [L.S.] for me, and at that point I didn't have a chance to do anything."

¶ 23 Regarding the new allegations concerning the August 2022 arrest, Roberts testified as follows:

"[T]here were supposedly drugs found on my school bus that I'm being charged

- 10 -

with possession of? That is an allegation but I'm not guilty of that yet. DCFS has been unable to—I haven't heard anything about indicated. They in fact—[Sherwin] held [L.S.] from me for several weeks, and I talked to them, talked to the supervisor, talked to the area administrator; and they ended up telling me that they didn't have any responsibility for having him keep [L.S.] from me. And so I went two weeks without seeing and talking to my son."

¶ 24 Sherwin's attorney then cross-examined Roberts, and the following exchange occurred:

"Q. [Y]ou said that when you were stopped, when [L.S.] was with you, you were on your way to the fair?

A. We were going over to the fair. He had fallen asleep. We were running a little late, wanted to see if we could still make it.

Q. That was 11:30 at night, Saturday night, August 27th?

A. We were going over to the fair at about 10:00 o'clock. I had to stop and get gas for the generator, and, like I said, [L.S.] fell asleep, so we ended up kind of driving around.

Q. You were charged with possession of meth, no valid registration on the vehicle and the trailer, is that right? ***

A. You said the trailer plates were stolen. There were no plates on the trailer because it was borrowed. The registration on the—on the bus, we'll deal with that when the traffic case comes, but that's a misunderstanding."

¶ 25                          C. The Arguments of the Parties

¶ 26 After Sherwin and Roberts testified, the trial court allowed the parties to make brief

arguments. Sherwin's attorney argued that L.S. was "in need of this order of protection for a couple of different reasons"—namely, (1) he was in a vehicle that was charged to have been stolen, in which "meth" was found and (2) L.S. was not in school. (We note that Roberts had testified she was homeschooling L.S.) Sherwin's attorney argued that he "could probably get *** the resolution primarily in the motion to restrict in the family case where this could probably be, but *** I think an [order of protection] is necessary because I think there needs to be some immediate relief. *** [L.S.] needs to be registered in school and kind of have the train put back on the tracks." Sherwin's attorney asked for a six-month order of protection for L.S. so he could "get this case consolidated with the [family] case and [the family court judge] can resolve both."

¶ 27        Roberts also made a brief argument. Regarding L.S.'s schooling, she argued that she had contacted the school for screening to determine if he could split up homeschooling and public school. Regarding the August 27, 2022, arrest, she stated, "So whatever was on that bus wasn't mine. The trailer wasn't stolen or I would definitely have a charge for a stolen trailer. It was returned to me in impound. *** I'm not a thief and I'm not a drug addict and I have no history of drug abuse or criminal activity." (We note that neither Sherwin nor Roberts made any argument relating to the original allegations contained within the petition.)

¶ 28                              D. The Trial Court's Ruling

¶ 29        The trial court granted petitioner an "interim" three-month order of protection, stating as follows:

> "I am going to find that there is enough evidence to grant the petition for
> order of protection. There is undisputed testimony there's a DCFS indicated report
> and that the child was present in a vehicle at such time when the mother was placed
> under arrest for possession of methamphetamine that was also found within the

vehicle. Therefore, I'm going to grant again the order of protection. I'm going to

do it for a term of three months, though. I think that's going to give the parties

enough time to get the family case in front of Judge Lane and for him to look at the

entirety of the circumstances and to make a decision at that point whether the order

of protection should be continued or ideally that there's some type of agreement or

hearing held on the restricted parenting issue."

(We note that the above statements constitute the entirety of the court's remarks supporting its

ruling.)

¶ 30        After the trial court ruled, the following exchange occurred:

"ROBERTS: Where is the indicated report from DCFS? I haven't seen

that—

THE COURT: I haven't either, but—

ROBERTS: You're going to take their word for it?

THE COURT: That's all I have at this point.

ROBERTS: That kept them—

THE COURT: I'm not going to get into this right now, so you need to wait

outside until you get the order of protection and then make sure that the child is

turned over by noon, okay?"

¶ 31        At that point, the proceedings ended. The trial court issued a written order of

protection valid from September 27, 2022, through December 27, 2022, naming L.S. as the

protected party. The order (1) placed physical care and possession of L.S. with Sherwin and

(2) prohibited Roberts from being within 300 feet of L.S. The court reserved the issue of parenting

time, noting in the margin of the order that parenting time would be "addressed in [Knox County

case No.] 21[-]F[-]90."

¶ 32       This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34       Roberts appeals, arguing that the trial court erred by issuing the order of protection because the record contained no evidence of abuse or harassment. Roberts asserts several other arguments that we need not reach because we agree that the court's order was not supported by the evidence. Accordingly, we reverse the judgment of the trial court and vacate the order of protection.

¶ 35                         A. Lack of Appellee Brief

¶ 36       Sherwin has not filed a brief on appeal. "A reviewing court is not compelled to serve as an advocate for the appellee and is not required to search the record for the purpose of sustaining the trial court's judgment." *Benjamin v. McKinnon*, 379 Ill. App. 3d 1013, 1019, 887 N.E.2d 14, 19 (2008). "However, if the record is simple and the claimed errors are such that the reviewing court can easily decide them without the aid of an appellee's brief, that court should decide the merits of the appeal." *Id.*

¶ 37       Because a primary issue in this appeal is whether the record supports the trial court's finding that Sherwin proved by a preponderance of the evidence that L.S. was abused, we conclude that we can easily determine the merits of this appeal without an appellee's brief.

¶ 38                              B. Mootness

¶ 39       Although Sherwin failed to file a brief, we *sua sponte* address the mootness of Roberts's appeal because the order of protection expired on December 27, 2022.

¶ 40       "A case on appeal becomes moot when the issues involved no longer exist because events occurring after the filing of appeal make it impossible for the appellate court to grant

effective relief." *Lutz v. Lutz*, 313 Ill. App. 3d 286, 288, 728 N.E.2d 1234, 1236 (2000). In the present case, Roberts requests that the order of protection be vacated, which is relief this court can grant, despite the expiration of the order of protection.

¶ 41 Moreover, this case involves a pending family case with overlapping issues. The Knox County circuit court's online docket shows that, before the order of protection expired in this case, the trial court entered a "Temporary Order," which it also filed in the pending family case between the parties. Accordingly, the record is unclear whether the order of protection has been extended or modified, or to what extent the order of protection affects the family case.

¶ 42 Even assuming the expiration of the order of protection rendered this case formally moot, the issues presented are still reviewable under the public interest exception to the mootness doctrine. *Id.* "Under the public interest exception, a court may review a moot issue on the merits if (1) the moot question is public in nature, (2) it is desirable to provide an authoritative determination so as to offer guidance for public officers, and (3) it is likely that the question will reappear." (Internal quotation marks omitted.) *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶ 12, 133 N.E.3d 117.

¶ 43 In the present case, all three requirements are met. First, courts have held that the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2020)) "addresses a grave societal problem and it is of public interest that the underlying purpose of the Act be achieved." *Whitten v. Whitten*, 292 Ill. App. 3d 780, 784, 686 N.E.2d 19, 22 (1997); *Landmann*, 2019 IL App (5th) 180137, ¶ 12. Second, achieving the purpose of the Act "can only be accomplished if courts properly apply the requirements of the Act." *Whitten*, 292 Ill. App. 3d at 784. Third, and perhaps most importantly, the present case involves an issue important to the public beyond mere sufficiency of the evidence. In this case, the petitioner misused the Act to litigate

family custody issues, and the trial court, by issuing the order of protection, gave its imprimatur to that misuse. The resolution of this case might discourage other litigants and trial courts from similarly misusing the Act. In other words, guidance on this issue for public officials is in the public interest and is necessary for future litigants. See *Landmann*, 2019 IL App (5th) 180137, ¶ 12 ("The Act addresses issues of great public interest [that can] only be accomplished if the courts properly apply the statutory requirements," and if "questions as to the Act's requirements are likely to reappear, [it is] desirable [for reviewing courts to provide] guidance.").

¶ 44 Additionally, this case is reviewable under the collateral consequences exception, which has primarily been applied in involuntary commitment proceedings. The collateral consequences exception applies when a party has "suffered, or [is] threatened with, an actual injury traceable to the defendant and [is] likely to be redressed by a favorable judicial determination." (Internal quotation marks omitted.) *In re Alfred H.H.*, 233 Ill. 2d 345, 361, 910 N.E.2d 74, 83 (2009); see also *In re Splett*, 143 Ill. 2d 225, 228, 572 N.E.2d 883, 885 (1991) (Although the respondent had been released from involuntary admission, "[r]eview [was] nonetheless appropriate, as the collateral consequences related to the stigma of an involuntary admission may confront [the] respondent in the future."); *In re Daryll C.*, 401 Ill. App. 3d 748, 753, 930 N.E.2d 1048, 1053 (2010) (applying the collateral consequences exception because the "collateral consequences of having been involuntary committed will attach to the respondent and could be used against him in future proceedings").

¶ 45 In *Carryl v. Fraser*, 2016 IL App (1st) 152376-U, the First District reviewed an order of protection under the collateral consequences exception because "the [plenary order of protection], which involves his minor daughters and is based on a finding of abuse ***, has *** ramifications on his personal, family, and legal relationships." *Carryl*, 2016 IL App (1st)

152376-U, ¶ 47.

¶ 46    Likewise, in the present case, the order of protection entered against Roberts, which was (1) not supported by any evidence of abuse to L.S. and (2) the result of misuse of the Act to litigate custody issues, would likely have ramifications in Roberts's family case.

¶ 47    Accordingly, we will review the merits of this appeal.

¶ 48          C. The Applicable Law

¶ 49    Orders of protection are governed by article II of the Act. 750 ILCS 60/201 *et seq.* (West 2020). The persons protected by the Act include "any person abused by a family or household member" (*id.* § 201(a)(i)), and a petition for an order of protection may be filed "by any person on behalf of a minor child." *Id.* § 201(b)(i).

¶ 50    The central issue in a proceeding to obtain an order of protection is whether the petitioner (or, in this case, the minor child) has been abused. *Best v. Best*, 223 Ill. 2d 342, 348, 860 N.E.2d 240, 244 (2006). The petitioner must prove abuse by a preponderance of the evidence. *Id.*

¶ 51    " 'Abuse' means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person *in loco parentis*." 750 ILCS 60/103(1) (West 2020). " 'Harassment' means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7).

¶ 52    A trial court's finding that a petitioner has been abused is reversed only if it is against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 350. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Id.*

¶ 53                                D. This Case

¶ 54          The trial court's judgment granting Sherwin's petition for an order of protection was against the manifest weight of the evidence because there was no evidence of abuse or harassment of L.S.

¶ 55          1. *The Trial Court's Stated Bases for Granting the Order of Protection*

¶ 56          We first address the trial court's stated bases for granting Sherwin's petition for an order of protection. When ruling, the court provided only two bases for its finding that there was "enough evidence" to grant the petition for an order of protection, remarking that there was "undisputed testimony" (1) "there's a DCFS indicated report" and (2) L.S. "was present in a vehicle at such time when the mother was placed under arrest for possession of methamphetamine that was also found within the vehicle." The court's findings are not supported by the evidence.

¶ 57                          a. The Alleged Indicated DCFS Report

¶ 58          First, the trial court is simply incorrect that there was undisputed testimony that a DCFS indicated report existed. Sherwin testified that DCFS initiated an investigation into child endangerment following Roberts's August 2022 arrest. His counsel asked whether the investigation was "indicat[ed] one way or the other." Sherwin answered that he was told (by an unidentified person) "it was basically ruled as indicated, which means there's enough evidence to consider it true." Counsel then asked whether the investigation was ongoing, and Sherwin's answer was far from clear: "When it's considered indicated, I think that's a ruling, but I'm not sure. As far as I know *** she's supposed to be getting me a *** copy of the report."

¶ 59          Even if Sherwin's testimony was the only evidence regarding the DCFS investigation, it would fail to establish that a DCFS investigation into child endangerment was "indicated." Sherwin's testimony established that he did not know (1) what precisely it meant for

- 18 -

a DCFS report to be indicated or (2) whether the investigation was completed. Not only did he fail to present the trial court with any document proving a DCFS investigation was indicated, Sherwin stated he had not yet received "a copy of the report."

¶ 60　　　　Roberts, on the other hand, testified that she had been in contact with DCFS personnel and she had not "heard anything about indicated." The trial court's finding that there was "undisputed testimony" of an indicated DCFS report is simply incorrect. Sherwin presented no evidence of the existence of an indicated report of child endangerment, and Roberts denied the existence of any such report.

¶ 61　　　　In addition, even if Sherwin had proven that Roberts's arrest resulted in an indicated DCFS report for child endangerment, Sherwin would still have failed to prove, even by a preponderance of the evidence, that L.S. had suffered any abuse.

¶ 62　　　　　　　　　　b. L.S.'s Alleged Presence at Roberts's Arrest

¶ 63　　　　Second, and similarly, L.S.'s presence when Roberts was arrested for possession of methamphetamine does not constitute "abuse" or "harassment" within the meaning of the Act. "Abuse" may occur in the form of "harassment," which requires conduct that "cause[s] emotional distress to the petitioner" (or, in this case, the minor child). 750 ILCS 60/103(7) (West 2020). Sherwin offered no evidence that L.S. was distressed. Roberts testified that when she was stopped by the police (1) it was after 11:30 p.m., (2) she was driving her school bus, and (3) L.S. had fallen asleep. Roberts stated that she called her friend, who was a block away, to pick up L.S. No evidence was presented that L.S. was even awake to witness Roberts's arrest. See *In re Marriage of Young*, 2013 IL App (2d) 121196, ¶ 28, 990 N.E.2d 788 (holding the respondent's conduct of using his computer to view pornography did not constitute "harassment" to support the trial court's granting an order of protection on behalf of the respondent's child because no evidence existed his child

ever used the computer or witnessed the respondent viewing pornography). We reiterate that Sherwin, as the petitioner, had the burden to prove abuse by a preponderance of the evidence. *Best*, 223 Ill. 2d at 348.

¶ 64 Moreover, even assuming that the substance found in Roberts's vehicle was indeed methamphetamine (which Sherwin also failed to prove), Roberts's exposing L.S. to illicit drugs or substance abuse would have constituted neglect, not abuse. The plain language of the Act permits a court to issue an order of protection based on "neglect" only for "high-risk adult[s] with disabilities." 750 ILCS 60/201(a)(ii) (West 2020). Because L.S. does not fall into this limited class, neglect could not have been a proper basis for the issuance of an order of protection.

¶ 65 2. *The Remaining Evidence*

¶ 66 Under the manifest weight of the evidence standard, this court may affirm the trial court's ruling on any basis supported by the record. *Baumgartner v. Greene County State's Attorney's Office*, 2016 IL App (4th) 150035, ¶ 41, 52 N.E.3d 654. However, after thoroughly reviewing the allegations in the petition and the evidence presented at the hearing, we conclude that none of Sherwin's allegations find evidentiary support upon which this court could affirm the trial court's judgment.

¶ 67 Sherwin's petition for an order of protection contained written allegations of several incidents spanning a time period from 2019 through July 2022. These allegations went largely unaddressed at the hearing on the petition, except for the following exchange between Sherwin and his attorney during Sherwin's direct examination:

"Q. Okay. You have made a number of allegations in the—in the petition for order of protection; is that right?

A. Correct.

Q. And these are based upon personal knowledge and confirmation that you were able to obtain prior to coming in here and signing those allegations in the petition?

A. Correct.

* * *

Q. Okay. The—the allegations without going into detail identifies four specific incidents which—and these are included in your handwriting on the petition, correct?

A. Correct.

Q. And these are true to the best of your ability and knowledge?

A. Correct."

¶ 68    A review of the police reports Sherwin attached as exhibits to his petition shows that Sherwin had no firsthand knowledge of the events described therein. And Sherwin did not present any testimony from a witness who had personal knowledge, such as a responding police officer. In fact, Sherwin presented no evidence in support of the incidents alleged in his petition, and Roberts made no admissions. Ironically, when Roberts attempted to question Sherwin about any incidents occurring over the past six years that harmed L.S., Sherwin's counsel objected on relevance grounds, stating "the allegations are the allegations." The trial court sustained the objection.

¶ 69    We repeat counsel's observation here: allegations are merely allegations; they are not evidence. Although Sherwin certified that everything in his petition was "true and correct" under penalty of perjury, verified allegations do not constitute evidence except by way of admission (735 ILCS 5/2-605 (West 2020)), and Roberts never made any such admissions.

¶ 70 Accordingly, the record demonstrates that no basis exists for this court to affirm the trial court's ruling, regardless of the trial court's reasoning.

¶ 71                                3. *Misuse of the Act*

¶ 72 Roberts argues on appeal that Sherwin "misused the Domestic Violence Act in an attempt at retaliation over a dispute about vacation parenting time." Because we have concluded that the trial court's order granting Sherwin's petition was not supported by any evidence of abuse to L.S., we need not reach this argument. However, we briefly address the misuse of the Act because, in this case, during argument, Sherwin's attorney admitted that he could "probably get *** the resolution primarily in the motion to restrict *in the family case where this could probably be*." (Emphasis added.) And the trial court itself issued only a three-month order, acknowledging that the family court was in a better position to address "the entirety of the circumstances." Moreover, Sherwin largely abandoned the serious allegations he included in his written petition by not presenting any evidence supporting them at the hearing, instead pursuing primarily (1) Roberts's August 2022 arrest and (2) L.S.'s schooling.

¶ 73 In this case, Sherwin failed to present any evidence that would justify the issuance of an order of protection. Instead, he improperly utilized the Act to litigate custody issues. Accordingly, we remind the trial court and the parties that "[o]btaining an order of protection is not the proper procedure for resolving child custody or visitation issues." *Radke v. Radke*, 349 Ill. App. 3d 264, 269, 812 N.E.2d 9, 13 (2004). "Those issues should be resolved under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 20[20]))." *Id.*; see also *Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1164-65, 728 N.E.2d 832, 839 (2000).

¶ 74                                4. *Roberts's Remaining Arguments on Appeal*

¶ 75 Because we have determined that the order of protection is not supported by the

evidence and is vacated, we need not address Roberts's remaining arguments on appeal.

¶ 76                              III. CONCLUSION

¶ 77        For the reasons stated, we conclude that the trial court's judgment granting the order of protection was against the manifest weight of the evidence. Because the court's determination that petitioner proved by a preponderance of the evidence that L.S. was abused was without an evidentiary basis, we (1) reverse the court's judgment and (2) vacate the order of protection.

¶ 78        Reversed and vacated.